[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12095

_____

D.C. Docket No. 0:17-cr-60312-JIC-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JUAN FLETCHER GORDILLO,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 17, 2019)

Before MARCUS, BLACK and WALKER,* Circuit Judges.

MARCUS, Circuit Judge:

---

* Honorable John Walker, Jr., United States Circuit Judge for the Second Circuit, sitting by designation.

Juan Fletcher Gordillo pled guilty to a single count charging him with possession of a firearm and ammunition by a prohibited person -- an alien unlawfully in the United States -- in violation of 18 U.S.C. § 922(g)(5)(A).  At sentencing, Gordillo objected to the base offense level set forth in the Presentence Investigation Report.  Under the United States Sentencing Guidelines, a base offense level of 20 accrues where the defendant was a prohibited person at the time of the offense and the offense involved a semiautomatic firearm in "close proximity" to a high-capacity magazine.  U.S.S.G. § 2K2.1, App. Notes 2.  Gordillo's locked Colt AR-15 was in a gun case in his bedroom, and high-capacity magazines were in a gun-range bag no more than ten feet away.  Because we see no error in the district court's finding that the magazines were in close proximity to the firearm, we affirm.

I.

Defendant Juan Fletcher Gordillo ("Gordillo") is a Guatemalan citizen who initially entered the United States on a non-immigrant visitor visa on July 18, 2004. Gordillo's visa expired on January 17, 2006.  He applied for a visa extension on January 19, 2006, and though his application was denied, he remained in the United States without authorization.  On November 27, 2017, Immigration and Customs Enforcement ("ICE") Enforcement and Removal Operations officers executed an arrest warrant for Gordillo's wife, Flor De Maria Cabrera Cortez ("Cortez"), at the couple's home in Fort Lauderdale, Florida.  When the officers arrived, they

2

encountered Gordillo and Cortez leaving the residence.  Neither had identification on them, but Cortez authorized the ICE officers to enter the residence to retrieve her passport and identification.  Before they initiated a protective sweep of the home, Gordillo admitted that there were firearms inside.  During the protective sweep, the officers recovered four weapons: a Berretta Px4 Storm .45 caliber pistol and a Fabrique Nationale FNS-9 9mm pistol in the family room, and a Colt AR-15 rifle and a Keltec KSG 12-gauge shotgun in the master bedroom.  Three of the firearms -- the pistols and the AR-15 -- were manufactured outside of the State of Florida. Officers also found four 30-round magazines in a gun-range bag in the small master bedroom some ten feet from the gun case.

Department of Homeland Security ("DHS") Investigations special agents responded to the scene, and requested permission from Gordillo and his wife to conduct an additional search of the residence.  Both Gordillo and Cortez consented to the search, and Gordillo admitted that there was a box of ammunition in the kitchen.  During the search, the agents located 50 cartridges of 9mm pistol rounds in the kitchen.

Gordillo was transported to the DHS Investigations office in Fort Lauderdale and read his Miranda rights.  After signing a waiver of those rights, he was interviewed and admitted to possessing the firearms and ammunition with the

3

knowledge that he was not authorized to purchase or possess firearms in the United States due to his immigration status.

## II.

On December 15, 2017, a grand jury sitting in the Southern District of Florida indicted Gordillo in one count with possession of a firearm and ammunition by a prohibited person -- an alien unlawfully in the United States -- in violation of 18 U.S.C. § 922(g)(5)(A). The statute makes it unlawful for "any person . . . being an alien . . . illegally or unlawfully in the United States . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition." Soon thereafter, Gordillo entered a guilty plea to the single count in the indictment. There was no written plea agreement.

The Presentence Investigation Report ("PSI") calculated Gordillo's base offense level at 20, pursuant to the Sentencing Guidelines § 2K2.1(a)(4)(B)(i)–(ii), because the offense involved a semiautomatic firearm that is capable of accepting a large-capacity magazine and the defendant was a "prohibited person" at the time of the offense. Since the offense involved three to seven firearms, the base offense level was increased by two points pursuant to § 2K2.1(b)(1)(A). But because Gordillo accepted responsibility and because he assisted the authorities in the investigation of his own misconduct, his offense level was decreased by two and one points, respectively. This left Gordillo with a total offense level of 19.

Gordillo had no criminal history, thereby yielding a Guidelines imprisonment range of 30 to 37 months. Since he was charged with a Class C Felony, the Guidelines range for supervised release was one to three years. The PSI identified no factors warranting a departure or variance from the Guidelines calculations.

Gordillo objected to the PSI on the ground that his crime did not involve a semiautomatic weapon within the meaning of the Guidelines. The Guidelines set a base offense level of 20 where the defendant was a prohibited person at the time of the offense and the offense "involved a . . . semiautomatic firearm that is capable of accepting a large capacity magazine." U.S.S.G. § 2K2.1(a)(4)(B)(i)–(ii). The Guidelines' Application Notes define "semiautomatic firearm that is capable of accepting a large capacity magazine" as "a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm." U.S.S.G. § 2K2.1, App. Note 2.

Gordillo urged that his base offense level should instead be calculated under § 2K2.1(a)(6), which provides a base offense level of 14 for a federal firearms offense where the defendant was a prohibited person and committed the offense with knowledge. He claimed that there was neither a high-capacity magazine attached to

5

the semiautomatic weapon, which is undisputed, nor one in "close proximity," asserting that the magazine in a separate bag across the room from the gun, which was itself locked with a gun lock and inside a case, did not qualify. He also argued that certain factors militated in favor of a departure from the advisory Guidelines range. Gordillo noted his complete and swift cooperation with law enforcement, the fact that he and his wife had entered the United States and overstayed their visas because his wife required eyesight-saving surgeries over a number of years that she could obtain only at the Bascom Palmer Eye Institute in Miami, and his extraordinary family ties and responsibilities.

At the sentencing hearing, DHS Investigations Agent Clancy Dunnigan testified that the two officers who conducted the initial protective sweep of the home told Dunnigan that the magazines were "found with the weapon." Dunnigan took this to mean the magazines were found either in the gun case with the firearm, or in the range bag some eight feet away. On cross examination, Agent Dunnigan conceded that he didn't know if the magazines were found in the gun case and that he was estimating the distance based on the small room size (what he thought was approximately ten feet). Dunnigan said the gun was in a hard case with hard clip locks, which were clipped, though he didn't know if they were actually locked. Gordillo also testified at the hearing that the magazines were in the gun-range bag separate from the firearm, and that the bag was "about 10 feet away" from the gun

6

case. Gordillo explained that the gun itself was locked, though he was not asked nor did he assert that the hard case was locked too. Gordillo's counsel argued that because "it was a locked gun, possibly the case it was in was locked, and the magazine was found separate from that weapon," the two were not in "close proximity" and therefore could not trigger the increased base offense level.

The district court varied downward slightly, but overruled Gordillo's objection to the base offense level. The sentencing judge found by a preponderance of the evidence that the AR-15 is a semiautomatic weapon capable of accepting a large-capacity magazine and that the magazine was found, "in the defendant's own word[s] in his testimony, 10 feet away from the AR-15." The court concluded that the magazine was in "close proximity" to the firearm for Guidelines purposes, and sentenced Gordillo to a 24-month term of imprisonment, followed by three years of supervised release, and a $2,000 fine.

This timely appeal ensued.

### III.

"We review the district court's application of the Sentencing Guidelines <u>de novo</u> and its findings of fact for clear error." <u>United States v. Smith</u>, 231 F.3d 800, 806 (11th Cir. 2000). "Clear error review is deferential, and 'we will not disturb a district court's findings unless we are left with a definite and firm conviction that a mistake has been committed.'" <u>United States v. Cruickshank</u>, 837 F.3d 1182, 1192

(11th Cir. 2016) (quoting United States v. Ghertler, 605 F.3d 1256, 1267 (11th Cir. 2010)).

"When interpreting the Guidelines, a 'guideline's meaning is derived first from its plain language and, absent ambiguity, no additional inquiry is necessary.'" United States v. Cruz, 713 F.3d 600, 607 (11th Cir. 2013) (quoting United States v. Turner, 626 F.3d 566, 573 (11th Cir. 2010)). "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Id. (quoting Stinson v. United States, 508 U.S. 36, 38 (1993)). Moreover, "[o]ur interpretation of the sentencing guidelines and accompanying commentary is governed by traditional rules of statutory construction." United States v. Perez, 366 F.3d 1178, 1182 (11th Cir. 2004).

The Guidelines yield a base offense level of 20 where the defendant was a prohibited person at the time of the offense and the offense "involved a . . . semiautomatic firearm that is capable of accepting a large capacity magazine." The Guidelines Application Notes define "semiautomatic firearm that is capable of accepting a large capacity magazine" as "a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more

8

than 15 rounds of ammunition was in close proximity to the firearm."  U.S.S.G. § 2K2.1, App. Note 2.

There is no dispute either that Gordillo was a "prohibited person" at the time of the offense or that there was no magazine physically attached to the firearm, making subsection (A) of Application Note 2 inapplicable.  The only question for us to decide, then, is whether a high-capacity magazine in a bag is in "close proximity" to a locked firearm in a case ten feet away in the same room.  This Court has never analyzed the meaning of "close proximity" in § 2K2.1(a).  Applying our usual mode of statutory interpretation, we begin with the plain language of the authoritative Application Notes.  The phrase "close proximity" denotes nearness in either physical space or time.  See WEBSTER'S NEW WORLD COLLEGE DICTIONARY (5th ed. 2018) (defining "close" as "with little space between" or "near together" and defining "proximity" as "the state or quality of being near; nearness in space, time, etc."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) (defining "close" as "in proximity of space or time" and defining "proximity" as "the quality or state of being proximate, next, or very near (as in time, place, relationship)"); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (1976) (defining "close" as "[p]roximate in time, space, or relation; near" and defining "proximity" as "[t]he state, quality, or fact of being near or next; closeness").

9

The current version of § 2K2.1 and its corresponding Application Note 2 were adopted in the 2006 amendments to the Guidelines.  See U.S.S.G. App. C, Amend. 691 (Nov. 2006); see also United States v. Davis, 668 F.3d 576, 577–78 (8th Cir. 2012) (explaining the amendment history of § 2K2.1 to answer the distinct question of whether a temporarily inoperable firearm constitutes a semiautomatic weapon under the provision).  Before the 2006 amendments, the Guidelines simply cross-referenced the statutory definition of a semiautomatic weapon contained in the federal assault weapons ban, 18 U.S.C. § 921(a)(30) -- that is, the Guidelines provided for a base offense level of 22 when an offense "involved a firearm described in . . . 18 U.S.C. § 921(a)(30)" and the offender was at the time of the offense a "prohibited person."  See U.S.S.G App. C, Amend. 691 (Nov. 2006).  The assault weapons ban, in turn, defined "semiautomatic assault weapon" as any of several enumerated firearms -- including the Colt AR-15 -- or, alternatively, as a firearm "that has an ability to accept a detachable magazine" and at least two other characteristics enumerated in the statute.  18 U.S.C. § 921(a)(30) (2004).

The 2006 amendments were intended to clarify that the enhanced base offense levels continued to apply in the wake of the sunset of the federal assault weapons ban in 2004.  Explaining the "reason for amendment," the Commission noted that it had "received information regarding inconsistent application as to whether the enhanced base offense levels apply to these types of firearms in light of the ban's

10

expiration." U.S.S.G. App. C, Amend. 691 (Nov. 2006). The amendment history says nothing explicit about the "close proximity" requirement. But to the extent the amendment history tells us anything, it is that the Commission believed the enhanced base offense levels should continue to apply to "these types of firearms." Id. (emphasis added). This suggests the Commission was concerned with identifying the type of gun -- making sure the component parts were all present and could be identified as part of a corresponding firearm and magazine.

Although we have never addressed the meaning of "close proximity" in the context of § 2K2.1(a), we have addressed proximity between guns and drugs in relation to the specific offense characteristic enhancements found in § 2K2.1(b) (enhancements for firearms offenses) and in § 2D1.1(b) (enhancements for drug offenses). Section 2K2.1(b)(6)(B) provides for an enhancement where the defendant "used or possessed any firearm or ammunition in connection with another felony offense." U.S.S.G. § 2K2.1(b)(6)(B) (emphasis added). Application Note 14 explains that the enhancement applies "in the case of a drug trafficking offense in which a firearm is found in close proximity to drugs, drug-manufacturing materials, or drug paraphernalia." U.S.S.G. § 2K2.1, App. Note 14(B) (emphasis added). The enhancement is warranted based on proximity, the Note explains, "because the presence of the firearm has the potential of facilitating" the drug offense. Id. This language was also added in the 2006 amendments, in response to a circuit split as to

11

what constituted possession of a firearm "in connection with" burglary or drug offenses.  U.S.S.G. App. C, Amend. 691 (Nov. 2006).  The Commission noted that it intended to conform the Guidelines to Smith v. United States, 508 U.S. 223 (1993), which had held that 18 U.S.C. § 924(c)(1)'s "use" requirement meant that the gun be used to "facilitate[] or further[] the drug crime."  Smith, 508 U.S. at 232.  In other words, "close proximity" was intended to be a proxy for the potential of the gun to facilitate the drug crime.  "A firearm found in close proximity to drugs or drug-related items simply 'has' -- without any requirement for additional evidence -- the potential to facilitate the drug offense."  United States v. Carillo-Ayala, 713 F.3d 82, 92 (11th Cir. 2013).  Similarly, § 2D1.1(b) provides an enhancement when a dangerous weapon is possessed during certain drug trafficking offenses, and Application Note 11(A) clarifies that "[t]he enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense."  U.S.S.G. § 2D1.1(b), App. Note 11(A).

We have discussed proximity between firearms and drugs in a number of cases, but have never explicitly elaborated on its meaning.  Rather, in each of those cases we have applied the phrase's plain meaning and looked to both the physical distance between the firearm and the drugs or drug-related items and the accessibility of the firearm.  See, e.g., United States v. Lopez-Garcia, 565 F.3d 1306, 1322 (11th Cir. 2009) (analyzing whether a prior conviction would have constituted a violation

of § 924(c), noting that "when he was apprehended for the drug offense, [the defendant] was found under the covers of a bed, along with the gun, a quantity of methamphetamine, and several hundred dollars in cash" and explaining that "[t]he nexus between the gun and the drug trafficking here is plainly established by, for example, the accessibility of the firearm to [the defendant], and the proximity of the gun to the drugs and the drug profits") (emphasis added); United States v. Trujillo, 146 F.3d 838, 847 (11th Cir. 1998) (firearm found in front office of warehouse in which 300 kilograms of cocaine was stored); United States v. Flennory, 145 F.3d 1264, 1270 (11th Cir. 1998) (gun located in a car across the street from a vacant lot where the defendant was selling drugs was possessed "in connection with" the offense because the defendant "could have easily and quickly retrieved the weapon from the vehicle if it became necessary to avoid an arrest, or to defend himself from a theft of the cocaine or the money he received from his sales"), superseded on other grounds as recognized by United States v. Brown, 332 F.3d 1341 (11th Cir. 2003); United States v. Hall, 46 F.3d 62, 63–64 (11th Cir. 1995) (per curiam) (handgun found in dresser drawer in same bedroom with scales, a ziplock bag containing cocaine residue, and a purse containing $12,000 in cash).

Because "[o]ur interpretation of the sentencing guidelines and accompanying commentary is governed by traditional rules of statutory construction[,] . . . [w]here the same language appears in two guidelines, it is generally presumed that the

13

language bears the same meaning in both." Perez, 366 F.3d at 1182; see also ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 170 (2012) (describing the canon of consistent usage). The phrase "close proximity" means the same thing in Application Note 2 (semiautomatic weapons) as it does in Application Note 14 (connection between drugs and guns). This presumption is all the more appropriate where the language appears not in two different guidelines, but within the Application Notes of the same guideline section. Indeed, Application Notes 2 and 14 using the phrase "close proximity" were added simultaneously, in the 2006 amendments. There is no reason to believe the Sentencing Commission meant anything other than the plain meaning afforded "close proximity" in both situations.

At bottom, physical distance is one component of accessibility, and in both the guns and drugs context and in the semiautomatic weapon and high-capacity magazine context, we are looking for a close connection between the items. Physical distance, a component of accessibility, is a powerful indicator that two items are related. Is the firearm close enough and accessible enough to have the potential to be used in the drug crime? And is the high-capacity magazine close enough and accessible enough to be used in the weapon capable of receiving it?

Ultimately, we think that, as its plain language suggests and as our analysis of proximity in the related cases dealing with guns and drugs indicates, "close proximity" encompasses both physical distance and accessibility. In both contexts,

14

we are looking for a close connection between the items.  Physical distance alone may not dispositive.  If, for example, a semi-automatic weapon were found in one home of a duplex apartment and a high-capacity magazine in the separately owned home next door just on the other side of a shared wall, even very close physical distance would not necessarily place those items in close proximity for Guidelines purposes. Physical proximity is necessary to find accessibility, but physical distance may not end the story.

Under a definition of "close proximity" that accounts for both physical distance and accessibility, a semiautomatic weapon -- even a locked firearm inside a case -- is in "close proximity" to a high-capacity magazine in a bag no more than ten feet away in the same small bedroom.  We have little doubt that ten feet is close physical proximity.  Relying on the idea of accessibility (but nevertheless rejecting any analogy to the guns and drugs cases), Gordillo argues that the critical facts militating against a finding of close proximity are that the gun was locked and in a case and the magazines were found in a separate bag.  He made no specific claim to the district court -- and indeed none in his briefing to us -- about how long it would take to retrieve the magazines from the bag, unlock the case, and insert a magazine into the firearm.  And he does not claim that those high-capacity magazines were not intended for use in the Colt AR-15.  The firearm and magazines were ten feet apart in the same room.  They were both physically proximate and readily accessible.

15

Under Gordillo's preferred reading, however, anytime a semiautomatic weapon is locked and in a gun case and a high-capacity magazine is in a separate container, the enhanced base offense level in the Guidelines would be inapplicable. But the Guidelines are not a safe-storage law. They are intended to punish firearms crimes involving particularly dangerous <u>types</u> of weapons. Gordillo does not dispute that those four high-capacity magazines were in physical proximity to the firearm or that they were actually intended for use in that firearm. His safe-storage practices notwithstanding, Gordillo is subject to the enhanced base offense level under § 2K2.1(a)(4)(B)(i)–(ii).

We can find no basis on which to overturn the district court's factual findings regarding the proximity of the AR-15 to the magazines, nor its legal conclusion that the relationship of the two constituted "close proximity" for Guidelines' purposes. Accordingly, we affirm.

**AFFIRMED.**

16