**FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

DEREK STEVEN TRUMBULL,

*Defendant - Appellant*.

No. 23-912

D.C. No.
9:22-cr-00052-
DLC-1

OPINION

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, District Judge, Presiding

Argued and Submitted May 6, 2024
Seattle, Washington

Filed August 22, 2024

Before: William A. Fletcher, Carlos T. Bea, and John B.
Owens, Circuit Judges.

Opinion by Judge Owens;
Concurrence by Judge Bea

# SUMMARY[*]

## Criminal Law

The panel affirmed a sentence imposed on Derek Steven Trumbull following his guilty plea to being a felon in possession of a firearm.

Trumbull challenged the district court's calculation of his Guidelines range—specifically, the increase of his offense level under U.S.S.G. § 2K2.1(a)(4)(B) on the ground that the offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine. Section 2K2.1 does not define a "semiautomatic firearm that is capable of accepting a large capacity magazine," but Application Note 2 of the commentary to § 2K2.1 says it means:

> a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

Trumbull did not dispute that the firearm he possessed, a Glock 17 loaded with a magazine containing seventeen

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

rounds of nine-millimeter ammunition, fell within Application Note 2. Instead, he attacked Application Note 2 on its face as an invalid interpretation of § 2K2.1 under *Kisor v. Wilkie*, 588 U.S. 558 (2019).

The panel held that Application Note 2's definition of "large capacity magazine" warrants deference under *Kisor* because (1) the term "large capacity magazine" is ambiguous within the meaning of *Kisor* because of the relative nature of the word large; (2) Application Note 2 is a reasonable interpretation of "large capacity magazine"; and (3) Application Note 2 meets the three "especially important markers for identifying" when deference is appropriate in that (a) Application Note 2 is the Sentencing Commission's official position, (b) the interpretation implicates the agency's substantive expertise, and (c) Application Note 2 was an exercise of the Commission's fair and considered judgment.

The panel therefore concluded that the district court did not err in applying § 2K2.1(a)(4)(B), as interpreted by Application Note 2, to Trumbull's base offense level.

Concurring in the judgment, Judge Bea disagreed with the majority that Application Note 2 of the commentary to § 2K2.1 is entitled to deference under *Kisor* because, in his view, the term "large capacity magazine" is not "genuinely ambiguous." Applying the traditional tools of construction to interpret the term "large capacity magazine," and applying that term to the facts of this case, he concluded that the Glock 17 that Trumbull possessed at the time of the offense—which could accept a magazine with 17 rounds of ammunition—unambiguously qualifies as a "semiautomatic firearm that is capable of accepting a large capacity

magazine" as that term was understood when the current version of § 2K2.1 was promulgated.

## COUNSEL

Karla E. Painter (argued), Assistant United States Attorney, District of Montaana; Jesse A. Laslovich, United States Attorney; United States Department of Justice, United States Attorney's Office, Missoula, Montana; Tim Tatarka, Assistant United States Attorney, United States Department of Justice, United States Attorney's Office, Billings, Montana; for Plaintiff-Appellee.

John Rhodes (argued), Assistant Federal Public Defender; Rachel Julagay, Federal Defender, District of Montana; Federal Defenders of Montana (Missoula), Missoula, Montana; for Defendant-Appellant.

## OPINION

OWENS, Circuit Judge:

Derek Steven Trumbull pled guilty to being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and received a below Guidelines sentence of twenty-four months' imprisonment, followed by a three-year term of supervised release. He now challenges the calculation of his Guidelines range—specifically, the increase of his base offense level under U.S.S.G. § 2K2.1(a)(4)(B) (U.S. Sent'g Comm'n 2023). We affirm.

## I.   BACKGROUND

On March 8, 2022, a Missoula Motel 6 employee called 911 to report that a man had been passed out for over three hours in a running vehicle in the parking lot.  Officers arrived to conduct a welfare check and found Derek Steven Trumbull in the car with a Glock 17 on his hip.  The firearm was loaded with a magazine containing seventeen rounds of nine-millimeter ammunition, and Trumbull was also carrying two spare Glock magazines—one equipped with the standard seventeen rounds of nine-millimeter ammunition and the other with eighteen rounds of nine-millimeter ammunition.

Trumbull had multiple prior felony convictions.[1]  On October 26, 2022, he was indicted on federal felon-in-possession charges.  He pled guilty without a plea agreement to one count of being a prohibited person in possession of a firearm in violation of 18 U.S.C. § 922(g)(1).

The Probation Office's Presentence Investigation Report ("PSR") calculated Trumbull's base offense level as twenty under U.S.S.G. § 2K2.1 (U.S. Sent'g Comm'n 2023), which is the Guideline for a violation of 18 U.S.C. § 922(g)(1).  Section 2K2.1 sets the base offense level at twenty if "the (i) offense involved a (I) *semiautomatic firearm that is*

---

[1] Specifically, Trumbull had two felony convictions for burglary, a felony conviction for attempted burglary, and a felony conviction for issuing a bad check.  He also had misdemeanor convictions for theft, criminal trespass to a vehicle, conspiracy to commit theft, driving under the influence, and criminal possession of drug paraphernalia.

In the time between his arrest and indictment in this case, Trumbull was arrested and charged in Montana state court with criminal possession of dangerous drugs (a felony), criminal possession of drug paraphernalia (a misdemeanor), and probation violations.

*capable of accepting a large capacity magazine* . . . and (ii) defendant (I) was a prohibited person at the time the defendant committed the instant offense." § 2K2.1(a)(4)(B) (emphasis added).    Section 2K2.1 does not define a "semiautomatic firearm that is capable of accepting a large capacity magazine," but Application Note 2 of the commentary to § 2K2.1 ("Application Note 2") says it means:

> a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

§ 2K2.1 cmt. n.2.

The PSR deducted three levels for Trumbull's acceptance of responsibility, so his total offense level was seventeen.  Based on Trumbull's offense level of seventeen and criminal history category of IV, his Guidelines range was thirty-seven to forty-six months' imprisonment.

Trumbull objected to the PSR.  He did not dispute that the firearm he possessed fell within Application Note 2. Instead, he attacked Application Note 2 on its face as an invalid interpretation of § 2K2.1 under *Kisor v. Wilkie*, 588 U.S. 558 (2019).  The district court overruled Trumbull's objection and applied § 2K2.1, as interpreted in Application Note 2, in calculating Trumbull's Guidelines range.

The district court sentenced Trumbull to a below Guidelines sentence of twenty-four months' imprisonment, followed by a three-year term of supervised release, to run concurrently with any sentences imposed in pending state proceedings. Trumbull has finished serving his federal prison term, and his federal supervised release will begin once he is released from state custody.

On appeal, Trumbull reasserts that Application Note 2 is an invalid interpretation of the phrase "semiautomatic firearm that is capable of accepting a large capacity magazine" in § 2K2.1, and the district court erred by adopting it.

## II.   DISCUSSION

### A.  Standard of Review and *Kisor* Deference

We review a district court's interpretation of the Guidelines de novo. *United States v. Castillo*, 69 F.4th 648, 652 (9th Cir. 2023).

The Supreme Court has said that the commentary to the Guidelines "is akin to an agency's interpretation of its own legislative rules." *Stinson v. United States*, 508 U.S. 36, 45 (1993). As a result, we apply *Kisor v. Wilkie*, 588 U.S. 558 (2019), to determine whether to defer to the commentary's interpretation of a Guideline.[2] *Castillo*, 69 F.4th at 655–56.

---

[2] In *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), the Supreme Court overruled *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), which "required courts to defer to 'permissible' agency interpretations of the statutes those agencies administer." *Loper Bright*, 144 S. Ct. at 2254. The Supreme Court did not call *Kisor* into question in *Loper Bright* (and in fact cited it, *see id.* at 2261), and as the concurrence acknowledges did not overrule it, so we continue to apply it.

**B. Application Note 2's Definition of "Large Capacity Magazine" Warrants Deference under *Kisor***

*Kisor* held that a court should defer to an agency's interpretation of its own regulation if (1) the regulation is "genuinely ambiguous" after "exhaust[ing] all the 'traditional tools' of construction"; (2) the interpretation is "reasonable"; and (3) "the character and context of the agency interpretation entitles it to controlling weight" because (i) the interpretation is the agency's "'official position,' rather than any more ad hoc statement not reflecting the agency's views"; (ii) the interpretation "implicate[s] [the agency's] substantive expertise"; and (iii) the interpretation reflects the agency's "fair and considered judgment." 588 U.S. at 574–79 (citations omitted). Application Note 2 satisfies these requirements.

First, the term "large capacity magazine" is ambiguous within the meaning of *Kisor* because of the relative nature of the word "large." In *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009), the Supreme Court considered whether to defer to the Environmental Protection Agency's interpretation of the phrase "best technology available for minimizing adverse environmental impact" under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). *Entergy Corp.*, 556 U.S. at 218–19. Like *Kisor*, *Chevron* required ambiguity for deference. *Chevron*, 467 U.S. at 842–43. In *Entergy Corp.*, the Court applied *Chevron* and upheld the agency's interpretation after rejecting the argument that "minimizing" conclusively meant "reducing to the smallest amount possible" because "'minimize' is a term that admits of degree and is not necessarily used to refer exclusively to the

'greatest possible reduction.'" *Entergy Corp.*, 556 U.S. at 218–19.

Like "minimize," "large" is ambiguous because it "admits of degree." *Id.* at 219.  The Oxford English Dictionary Online defines "large" as "[g]reat in size, amount, or degree; big; wide; full." *Large*, Oxford English Dictionary Online, https://www.oed.com/dictionary/ large_adj?tab=meaning_and_use#39730644 (last visited July 29, 2024).  "Large" is a comparative term.  Whether a magazine's capacity is "large" may vary depending on the context or the purpose for which the magazine is used.  As a result, there is "uncertain[y]" about the meaning of "large capacity magazine." *Kisor*, 588 U.S. at 566.

The structure of § 2K2.1 does not resolve this uncertainty, nor do its history or purpose.  The phrase "large capacity magazine" was added to § 2K2.1 in 2006, when the U.S. Sentencing Commission ("the Commission") amended § 2K2.1 to delete cross-references to expired provisions of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103–322, 108 Stat. 1796.  U.S.S.G., Supp. Appx. C. Amend. 691 (Nov. 1, 2006).  The Violent Crime Control and Law Enforcement Act of 1994 defined "large capacity ammunition feeding device" as "a magazine . . . that has a capacity of . . . more than 10 rounds of ammunition." Violent Crime Control and Law Enforcement Act of 1994 § 110103(b) (formerly codified at 18 U.S.C. § 921(a)(31)). This differing definition of "large capacity magazine" also suggests that the phrase is ambiguous.

Trumbull asserts that "large capacity magazine" is not "ambiguous" under *Kisor* because "[t]he plain language definition of large is 'relatively great.'"  Thus, Trumbull concedes that "'large' is a relative measure" but suggests

that this relativity is not enough for ambiguity within the meaning of *Kisor*. We disagree. A vague or imprecise regulation can be ambiguous under *Kisor*. *See Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1181 (11th Cir. 2021) (rejecting the argument that "when *Kisor* said a regulation must have 'multiple reasonable meanings,' it required, for the first time, that a regulation not be just 'vague' or lack precision . . . but that it satisfy essentially a term-of-art definition of 'ambiguous'"). Accordingly, because "large capacity magazine" is a relative term with a meaning that may vary depending on the context, it is ambiguous under *Kisor*.

Second, Application Note 2 is a reasonable interpretation of "large capacity magazine." At least twelve states restrict or regulate the possession of large capacity magazines,[3] and three of those states define large capacity magazine as Application Note 2 does.[4] Eight states restrict magazines capable of accepting ten rounds of ammunition.[5] Only one

---

[3] Cal. Penal Code § 32310, *held unconstitutional by Duncan v. Bonta*, 695 F. Supp. 3d 1206, 1213 (S.D. Cal. 2023); Colo. Rev. Stat. § 18-12-302; Conn. Gen. Stat. § 53-202x; Del. Code Ann. tit. 11, § 1469; Haw. Rev. Stat. § 134-8; 720 Ill. Comp. Stat. 5/24-1.10; Mass. Gen. Laws ch. 140, § 131M; N.J. Stat. Ann. § 2C:39-3, *held preempted on other grounds in Fed. Law Enf't Officers Ass'n v. Att'y Gen. N.J.*, 93 F.4th 122, 124 (3d. Cir. 2024); N.Y. Penal Law § 265.37 (originally setting the floor at seven rounds but now setting it at ten rounds per N.Y. Penal Law § 265.00); 11 R.I. Gen. Laws § 11-47.1-3; Vt. Stat. Ann. tit. 13, § 4021; Wash. Rev. Code § 9.41.370.

[4] Colo. Rev. Stat. § 18-12-301; 720 Ill. Comp. Stat. 5/24-1.10; Vt. Stat. Ann. tit. 13, § 4021.

[5] Cal. Penal Code § 16740; Conn. Gen. Stat. § 53-202w(a)(1); Haw. Rev. Stat. § 134-8; Mass. Gen. Laws ch. 140, § 121; N.J. Stat. Ann. § 2C:39-1; N.Y. Penal Law § 265.00; 11 R.I. Gen. Laws § 11-47.1-2; Wash. Rev. Code § 9.41.010.

state sets the floor higher.[6]  Likewise, Congress itself has previously defined "large capacity ammunition feeding device" as "a magazine . . . that has a capacity of . . . more than 10 rounds of ammunition."  Violent Crime Control and Law Enforcement Act of 1994 § 110103(b).  Application Note 2's interpretation of "large capacity magazine" as more than fifteen rounds "come[s] within the zone" of these other definitions—somewhere between ten and seventeen rounds. *Kisor*, 588 U.S. at 576.

Trumbull contends that "large capacity magazine" should be defined in relation to a standard capacity magazine, and that standard capacity should, in turn, be defined based on what is popular within the gun industry. The popularity of a firearm with a seventeen-round capacity does not defeat the reasonableness of Application Note 2. Something can be both popular and large, such as the standard capacity magazine of this popular firearm.  But the popularity of that firearm does not mean that a magazine that can accept more than fifteen rounds is not also a "large capacity magazine."

Trumbull also objects to the "numeric specificity" of Application Note 2.  He asserts that, by promulgating a bright-line rule, the Commission was legislating rather than interpreting.  But Application Note 2 is a valid interpretive rule because it "explain[s]" the Guidelines by specifying what constitutes "large."  *United States v. Kirilyuk*, 29 F.4th 1128, 1138 (9th Cir. 2022).  It does "not enact policy changes to them."  *Id.*  Consequently, Application Note 2's interpretation of "large capacity magazine" is reasonable.

---

[6] Del. Code Ann. tit. 11, § 1468 (more than seventeen rounds).

Finally, Application Note 2 meets the three "especially important markers for identifying" when deference is appropriate. *Kisor*, 588 U.S. at 576–77. First, the parties agree that Application Note 2 is the Commission's "official position," *id.* at 577 (quoting *United States v. Mead Corp.*, 533 U.S. 218, 257–59 & n.6 (2001) (Scalia, J., dissenting)), which weighs in favor of deference.

Second, in assessing the relative dangerousness of magazines of different capacities, the Commission acted within the scope of its authority, *see id.* at 577–78, to "establish sentencing policies and practices for the [f]ederal criminal justice system," 28 U.S.C. § 991(b)(1). Trumbull argues that Application Note 2 does not implicate the Commission's substantive expertise because it "parrots the statutory text" of the Violent Crime Control and Law Enforcement Act of 1994. But Application Note 2 does not "parrot the statutory text" because Application Note 2 provides a different (and more lenient) definition of large capacity magazine than the Violent Crime Control and Law Enforcement Act of 1994 did. Indeed, Application Note 2 sets a higher floor for "large capacity magazine."

Third, the Court in *Kisor* cautioned against deferring to a "convenient litigating position" or "new interpretation . . . that creates 'unfair surprise' to regulated parties." 588 U.S. at 579 (first quoting *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012); and then quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 170 (2007)). These concerns are not present here. While the Commission is not required to submit commentary to notice and comment or congressional review, the challenged definition in Application Note 2 was, in fact, published in the Federal Register with a "request[] [for] comment regarding whether there is an alternative definition [the

Commission] should consider," *see* Sentencing Guidelines for United States Courts, 71 Fed. Reg. 4782, 4789–90 (Jan. 27, 2006) (defining "[h]igh-capacity, semiautomatic firearm" as "a semiautomatic firearm that has a magazine capacity of more than [15] cartridges" (second alteration in original)), and submitted to Congress for review, Sentencing Guidelines for United States Courts, 71 Fed. Reg. 28063, 28069–71 (May 15, 2006).[7] These procedural steps support that Application Note 2 was an exercise of the Commission's

---

[7] Indeed, while "[c]ourts and commentators tend to justify treating commentary as less authoritative than the guidelines in part on the ground that '[u]nlike the Guidelines themselves, . . . commentary to the Guidelines never passes through the gauntlets of congressional review or notice and comment[,]' . . . their premise is mistaken." *United States v. Dupree*, 57 F.4th 1269, 1280 (11th Cir. 2023) (en banc) (Pryor, C.J., concurring) (second and third alterations in original) (citation omitted). "Unlike most agency interpretive rules, Guidelines commentary ordinarily goes through the same notice-and-comment and congressional review procedures as substantive guideline revisions," so "the difference between the Guidelines and the commentary ordinarily boils down to labels and formatting." *Id.* at 1280–81 (Pryor, C.J., concurring).

*See also* U.S. Sent'g Comm'n, Rules of Practice & Procedure, § 4.3 ("[T]he Commission will endeavor to provide, to the extent practicable, comparable opportunities [to publication in the Federal Register and public hearing procedure, as required by 28 U.S.C. § 994(x)], for public input on proposed . . . commentary . . . ."); *id.*, § 4.1 ("[T]o the extent practicable, the Commission shall endeavor to include amendments to . . . commentary in any submission of guideline amendments to Congress and put them into effect on the same November 1 date as any guideline amendments issued in the same year."); John S. Acton, *The Future of Judicial Deference to the Commentary of the United States Sentencing Guidelines*, 45 Harv. J.L. & Pub. Pol'y 349, 359 (2022) ("Lower courts have largely overlooked this change in practice and often mischaracterize the procedure that amendments to the commentary receive . . . .").

"fair and considered judgment." *Kisor*, 588 U.S. at 579 (quoting *Christopher*, 567 U.S. at 155).

## III.  CONCLUSION

Application Note 2's interpretation of "large capacity magazine" in § 2K2.1 meets the extensive requirements for deference laid out in *Kisor*. Therefore, the district court did not err in applying § 2K2.1(a)(4)(B), as interpreted by Application Note 2, to Trumbull's base offense level when calculating his Guidelines range.

**AFFIRMED.**

---

BEA, Circuit Judge, concurring in the judgment:

I agree that the Glock 17 that Defendant-Appellant Derek Trumbull possessed at the time of his offense qualifies as a "semiautomatic firearm that is capable of accepting a large capacity magazine" for purposes of enhancing his base offense level under the Sentencing Guidelines. *See* U.S.S.G. § 2K2.1(a)(4)(B).

But I do not agree that Application Note 2 of the commentary to § 2K2.1 is entitled to deference under *Kisor v. Wilkie* because, in my view, the term "large capacity magazine" is not "genuinely ambiguous." *See Kisor v. Wilkie*, 588 U.S. 558, 573 (2019). "Large capacity magazine" is not a term "genuinely susceptible to multiple reasonable *meanings*," unless the context in which it was used were to include publications such as *Time*. *See id.* at 581 (emphasis added); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) (deferring to an agency only "if the *meaning of the words used* is in doubt" (emphasis added)). All agree that the meaning of the term "large

capacity magazine," when used in relation to a firearm, is a firearm magazine that is "[g]reat in size, amount, or degree." *Large*, Oxford English Dictionary. When, as here, a term has an "unquestionable meaning," it is not made ambiguous merely because it has "uncertain application to various factual situations." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 31 (2012). People may disagree as to how many cartridges must fit into a magazine to make it "large." But disagreement does not constitute ambiguity. And *Kisor*, which recognized the "strong judicial role in interpreting rules," puts the onus on courts—not agencies—to interpret and apply unambiguous rules like § 2K2.1, even if those rules are vague or imprecise. *See Kisor*, 588 U.S. at 580.

Rather than "wave the ambiguity flag" merely because the "regulation [is] impenetrable on first read," *see id.* at 575, as the majority does today, I would "exhaust all the 'traditional tools' of construction" to interpret the term "large capacity magazine" and apply that term to the facts of this case, *see id.* (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984), *overruled by Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024)). Here, the Glock 17 that Trumbull possessed at the time of his offense—which could accept a magazine with 17 rounds of ammunition—unambiguously qualifies as a "semiautomatic firearm that is capable of accepting a large capacity magazine" as that term was understood when the current version of § 2K2.1 was promulgated. *See* U.S.S.G. § 2K2.1(a)(4)(B). That should be the end of the matter. We have "no business deferring to any other reading" when the regulatory language applies unambiguously to the facts before us. *See Kisor*, 588 U.S. at 575. After all, it "makes no sense to speak of a 'permissible' interpretation that is not the

one the court, after applying all relevant interpretive tools, concludes is best." *Loper Bright*, 144 S. Ct. at 2266.

Accordingly, I agree that the district court's sentencing order should be affirmed. But the majority's choice to assign interpretive authority over the unambiguous language in § 2K2.1 to the Sentencing Commission "rests on a profound misconception of the judicial role" and expands *Kisor* deference far beyond its limited scope. *See id.* at 2268. I therefore concur only in the judgment.

## I.

### A.

In 1994, Congress enacted the Violent Crime Control and Law Enforcement Act, Pub. L. No. 103–322, 108 Stat. 1796 (the "Act"). The Act made it unlawful to possess specified firearms, as well as "large capacity ammunition feeding devices," which it defined as a "magazine . . . that has a capacity of . . . more than 10 rounds of ammunition." Violent Crime Control and Law Enforcement Act, § 110103(b) (formerly codified at 18 U.S.C. § 922(a)(31)). The Act also directed the Sentencing Commission to amend the Sentencing Guidelines to provide for a sentencing enhancement in cases in which a "semiautomatic firearm is involved." *Id.* § 110501.

In response, the Sentencing Commission took two actions. First, it amended § 2K2.1 to cross-reference the Act and, in turn, to provide for an enhanced sentence in cases in which an offender possessed a firearm specified in the Act. U.S.S.G. § 2K2.1, Amend. 522 (Nov. 1995). Second, it amended § 5K2.17 to "provide a specific basis for an upward departure when a high-capacity semiautomatic firearm is possessed." U.S.S.G. § 5K2.17, Amend. 531 (Nov. 1995).

Section 5K2.17, like the Act, defined the term "high-capacity, semiautomatic firearm" as a firearm "that has a magazine capacity of more than ten cartridges." U.S.S.G. § 5K2.17 (1995).

In 2004, Congress allowed the weapons prohibitions of the Act to expire. Because § 2K2.1 had cross-referenced the provisions of the Act, the Sentencing Commission amended § 2K2.1 to "clarify that the enhanced base offense levels continued to apply in the wake of the sunset of the federal assault weapons ban." *United States v. Gordillo*, 920 F.3d 1292, 1298 (11th Cir. 2019); *see* U.S.S.G. § 2K2.1, Amend. 691 (Nov. 2006) (explaining that the Commission amended § 2K2.1 because it had "received information regarding inconsistent application as to whether the enhanced base offense levels apply . . . in light of the ban's expiration"). Accordingly, the Sentencing Commission deleted the cross-reference to the Act and incorporated the language in effect today: a base offense level enhancement applies if a § 922(g)(1) offender possessed a "semiautomatic firearm that is capable of accepting a large capacity magazine." *See* U.S.S.G. § 2K2.1, Amend. 691. Section 2K2.1, however, does not define the term "large capacity magazine." Rather, the Sentencing Commission issued Application Note 2 as commentary to § 2K2.1. Application Note 2 provides:

> [A] "semiautomatic firearm that is capable of accepting a large capacity magazine" means a semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or (B) a magazine or similar

device that could accept more than 15 rounds
of ammunition was in close proximity to the
firearm.

U.S.S.G. § 2K2.1, App. Note 2.

### B.

On March 8, 2022, Trumbull was arrested while in possession of a Glock 17. The firearm was loaded with a magazine containing 17 rounds of ammunition. Trumbull was also carrying one magazine that contained 17 rounds of ammunition and another that contained 18 rounds of ammunition. Officers also recovered a magazine containing 31 rounds of ammunition in the trunk of Trumbull's car. Trumbull, who had multiple prior felony convictions, was indicted under 18 U.S.C. § 922(g)(1), which makes it a crime for any person to possess a firearm if he had previously been convicted of at least one felony. Trumbull pleaded guilty.

At sentencing, the district court afforded *Kisor* deference to the commentary in Application Note 2 and enhanced Trumbull's base offense level from 14 to 20 pursuant to § 2K2.1. Specifically, the district court determined that Trumbull possessed a "semiautomatic firearm that is capable of accepting a large capacity magazine" under Application Note 2, because the firearm he possessed at the time of his offense "could accept more than 15 rounds of ammunition." U.S.S.G. § 2K2.1, App. Note 2. The district court imposed a sentence of twenty-four months' imprisonment, followed by a three-year term of supervised release.

On appeal, Trumbull argues that the district court erred when it afforded *Kisor* deference to the commentary in Application Note 2 to § 2K2.1.

## II.

Because courts have primary interpretive authority over questions of law, we review the district court's interpretation of the Sentencing Guidelines de novo. *See United States v. Rivera-Constantino*, 798 F.3d 900, 902 (9th Cir. 2015). As with any statute or regulation that comes before us, "[w]e interpret the Sentencing Guidelines using the ordinary tools of statutory interpretation." *United States v. Martinez*, 870 F.3d 1163, 1166 (9th Cir. 2017).

When the Sentencing Commission issues commentary that purports to interpret the Sentencing Guidelines, we apply the "demanding deference standard articulated in *Kisor*" to evaluate whether to give weight to that commentary. *United States v. Castillo*, 69 F.4th 648, 655 (9th Cir. 2023). Under *Kisor*, "the possibility of deference can arise only if a regulation is genuinely ambiguous." 588 U.S. at 573. Accordingly, if a Sentencing Guideline is unambiguous, *Kisor* "makes it impermissible to defer" to the commentary. *Castillo*, 69 F.4th at 663; *see Kisor*, 588 U.S. at 574–75 ("If uncertainty does not exist, there is no plausible reason for deference."). The baseline of judicial review stays in place, and it remains our duty to interpret the Sentencing Guidelines, as in any other statutory interpretation case. *See Kisor*, 588 U.S. at 580 (cabining the scope of agency deference to genuinely ambiguous regulations to "maintain[] a strong judicial role in interpreting rules").

Accordingly, the threshold question under *Kisor* is always whether a rule is "genuinely ambiguous." *Id.* at 573. No ambiguity, no deference. And a court may not merely "wave the ambiguity flag just because it found the regulation impenetrable on first read." *Id*. at 575. Rather, "before

concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction," just as "it would if it had no agency to fall back on." *Id.* (quoting *Chevron*, 467 U.S. at 843 n.9). In other words, *Kisor* requires us to conduct a searching inquiry into the meaning of a rule before assigning our interpretive authority—the core of the judicial power—to an agency. *See id.* at 580–81.

## A.

The majority concludes that the term "large capacity magazine" is ambiguous because the term "large" is relative, vague, and imprecise. Maj. Op. at 8–10. I do not dispute that characterization. But *Kisor* does not allow us to skirt our judicial role any time a regulation is vague, relative, or difficult to apply. *See Kisor*, 588 U.S. at 575 ("[H]ard interpretive conundrums, even relating to complex rules, can often be solved."). Rather, it is our duty as judges to resolve these uncertainties ourselves.

## 1.

The majority's assertion that § 2K2.1 is ambiguous because the term "large capacity magazine" is "vague or imprecise" overlooks the fundamental distinction between ambiguity and vagueness. Maj. Op. at 10; *see* Brian H. Bix, *A Dictionary of Legal Theory* 217 (2004) ("Vagueness should not be confused with ambiguity."). A term is ambiguous "when the question is which of two or more meanings applies," such as whether "table" refers to furniture or a mathematical chart. Scalia & Garner, *Reading Law* 31–32; *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 343 (1997) (explaining that the "ambiguity of statutory language is determined by reference to the language

itself")[1]. In contrast, a term is vague—not ambiguous—when its "unquestionable meaning has uncertain application to various factual situations." Scalia & Garner, *Reading Law* 32; *see Rafferty v. Denny's, Inc.*, 13 F.4th 1166, 1199 (11th Cir. 2021) (Luck, J., concurring in the judgment) (noting the "difference between more-than-one-meaning (ambiguity) and uncertain application (vagueness)"). If a court can deduce the meaning of the words after "performing [a] thoroughgoing review," the term is not ambiguous; it is vague. *See Kisor*, 588 U.S. at 581. And *Kisor* deference applies *only* to ambiguous rules, not to vague rules.

The Supreme Court recognized as much in *Kisor*. There, the Court reasoned that a term is ambiguous only if it is "genuinely susceptible to multiple reasonable meanings." *Id.* And it cited *Seminole Rock* to clarify that a court may defer to an agency "*only* 'if the *meaning of the words used* is in doubt.'" *Id.* at 574 (emphases added) (quoting *Seminole Rock*, 325 U.S. at 414). In other words, *Kisor* deference applies only when the meaning of the words used in the rule is uncertain; not when their *application* is uncertain. *See id.* at 573 ("[W]hen we use that term, we mean it—genuinely ambiguous, even after a court has resorted to all the standard tools of interpretation."). When a rule's *application* is uncertain, courts retain the responsibility to interpret and apply it, as in every other statutory interpretation case.

Here, the words "large capacity magazine," when used in reference to firearms, are not "genuinely susceptible to multiple reasonable meanings." *See id.* at 581. We all agree

---

[1] In *Robinson*, for example, the Supreme Court reasoned that the statutory term "employees" could have two plausible meanings: either (1) current employees only, or (2) both former and current employees. *Robinson*, 519 U.S. at 341–45.

that the meaning of the term is a firearm magazine that is "[g]reat in size, amount, or degree; big; wide; full." *Large*, Oxford English Dictionary. There is therefore no dispute regarding "the meaning of the words used." *See Seminole Rock*, 325 U.S. at 414. The question, rather, is whether the unambiguous language in § 2K2.1 *applies* to the firearm that Trumbull possessed at the time of his arrest. That makes the term "large capacity magazine" vague or imprecise, but not ambiguous. And *Kisor* requires judges—not agencies—to interpret and apply such vague but unambiguous rules. *See Kisor*, 588 U.S. at 580–81.

## 2.

In equating vagueness to ambiguity, the majority relies on *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208 (2009), where the Court applied the now-defunct *Chevron* doctrine. Maj. Op. at 8–9. There, the Court held that the Clean Water Act's mandate that the Environmental Protection Agency set standards that reflected "the best technology available for minimizing adverse environmental impact" did not "unambiguously preclude" the use of cost-benefit analysis. *Id.* at 218–20. The majority reasons that the Court found the term "minimize" to be ambiguous because it "admits of degree." *Id.* at 219. For two reasons, the majority is mistaken.

First, the Court in *Entergy* never determined that the term minimize was ambiguous. To the contrary, the Court—applying traditional tools of interpretation—held that the word "minimize" in the Clean Water Act *unambiguously* precluded the respondents' assertion that the term "best technology" included only those technologies that achieved "the greatest possible reduction in environmental harm." *Id.* at 219. The Court considered the use of the term minimize

"elsewhere in the Clean Water Act," and concluded that, "[i]f respondents' definition of the term 'minimize' is correct," other portions of the Clean Water Act would be "superfluous." *Id.* Of course, the Surplusage Canon is one of the "'traditional tools' of construction" that we must apply before finding a term genuinely ambiguous. *See Kisor*, 588 U.S. at 575 (quoting *Chevron*, 467 U.S. at 843 n.9); *see also* Scalia & Garner, *Reading Law* 174 (explaining that, under the Surplusage Canon, a word should not be given an interpretation that causes another provision "to have no consequence"). Thus, and with respect, the premise underlying the majority's understanding of ambiguity rests on a misreading of *Entergy*.

Second, in the wake of *Loper Bright*, the *Chevron* analysis in *Entergy* is no longer valid. *See Loper Bright*, 144 S. Ct. at 2273 ("*Chevron* is overruled."). To be sure, the Court in *Loper Bright* did not "call into question prior cases that relied on the *Chevron* framework." *Id.* But the Court was clear: this limitation applied only to prior holdings that "*specific* agency actions are lawful," pursuant to the doctrine of "statutory *stare decisis*." *Id.* (first emphasis added). The Court acknowledged its "change in interpretive methodology" meant that these precedents were "wrongly decided," but explained that mere error is "not enough to justify overruling a statutory precedent." *Id.* (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 266 (2014)). For future cases, however, the Court stated: "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires." *Id.*; *see also id.* at 2271 ("[T]he basic nature and meaning of a statute does not change when an agency happens to be involved. . . . The statute still has a best meaning, necessarily discernible by a

court deploying its full interpretive toolkit."). The majority's understanding of ambiguity, then, depends exclusively on a case with no precedential value.

In sum, the majority is incorrect that a term is ambiguous under *Kisor* merely because it is vague or "impenetrable on first read." *See Kisor*, 588 U.S. at 575. Except for those cases in which the words used are "genuinely susceptible to multiple reasonable meanings," it remains our duty to apply such vague and indefinite regulations to the facts before us, as we do all the time. *See id.* at 581. And here, the term "large capacity magazine" in § 2K2.1 has only one plausible meaning. Respectfully, the majority's choice to disregard our interpretive duties and assign them to the Sentencing Commission expands *Kisor* far beyond its intended scope.

## B.

The majority's expansion of *Kisor* deference is particularly troubling considering the Supreme Court's recent decision in *Loper Bright*. Although I acknowledge that *Loper Bright* did not expressly overrule *Kisor*, the majority is mistaken to brush *Loper Bright* aside and treat it as irrelevant to the interpretation of regulatory language. Maj. Op. at 7 n.2. The Court in *Loper Bright* made clear that courts cannot merely "throw up their hands," as the majority does today, when a term is difficult to apply. *See Loper Bright*, 144 S. Ct. at 2266. Indeed, *Loper Bright* questioned whether ambiguity can even serve as a valid benchmark when it comes to a court's interpretive role. As the Court put it:

> Ambiguity is a term that may have different meanings for different judges. One judge might see ambiguity everywhere; another

might never encounter it. A rule of law that is so wholly in the eye of the beholder invites different results in like cases and is therefore arbitrary in practice. Such an impressionistic and malleable concept cannot stand as an every-day test for allocating interpretive authority between courts and agencies.

*Id.* at 2270–71 (citations and internal quotations omitted).

The Court in *Loper Bright*, moreover, reasoned that "statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Id.* at 2266. It also explained that it "makes no sense to speak of a 'permissible' interpretation that is not the one the court, after applying all relevant interpretive tools, concludes is best," because "if it is not the best, it is not permissible." *Id.* Of course, those "interpretive tools" are the same tools the Court told us to exhaust in in *Kisor before* finding a regulation ambiguous. *Compare id.* (noting the "very point of the traditional tools of statutory construction—the tools courts use every day— is to resolve statutory ambiguities"), *with Kisor*, 588 U.S. at 575 (explaining a court "must exhaust all the traditional tools of construction" "before concluding that a rule is genuinely ambiguous" (internal quotations omitted)). *Loper Bright*, then, reiterated the searching inquiry that we must undertake before deferring to an agency under *Kisor*.

After the Court's landmark decision in *Loper Bright*, we should hesitate to expand *Kisor* deference beyond those cases in which "the meaning of the words used is in doubt." *See Seminole Rock*, 325 U.S. at 414; *Kisor*, 588 U.S. at 575, 581. In all other cases, such as this one, the regulation "just means what it means—and the court must give it effect, as the court would any law." *Kisor*, 588 U.S. at 575.

### III.

Because § 2K2.1 is unambiguous, I would independently interpret the term "semiautomatic firearm that is capable of accepting a large capacity magazine," and determine whether the Glock 17 that Trumbull possessed at the time of his offense qualifies. *See* U.S.S.G. § 2K2.1(a)(4)(B). This analysis requires the use of the "ordinary tools of statutory interpretation," *Martinez*, 870 F.3d at 1166, which "begin[s] and end[s] with the text and structure of the Guidelines," *United States v. Joey*, 845 F.3d 1291, 1297 n.8 (9th Cir. 2017) (internal quotations omitted). We may also consider "the context of the[] words" in light of the backdrop at the time the rule was enacted. *See United States v. Hansen*, 599 U.S. 762, 775 (2023); Scalia & Garner, *Reading Law* 167 ("Context is a primary determinant of meaning."). Here, the analysis of the text and structure, along with the context in which § 2K2.1 was promulgated, compels one conclusion: Trumbull's Glock 17, which had the capacity to accept 17 rounds, unambiguously qualifies as a "semiautomatic firearm that is capable of accepting a large capacity magazine." *See* U.S.S.G. § 2K2.1(a)(4)(B).

First, the current version of § 2K2.1 "was expressly modeled on its . . . predecessor" and, therefore, brought "the old soil with it." *See Hall v. Hall*, 584 U.S. 59, 72–73 (2018) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947)). As I have explained, § 2K2.1 previously cross-referenced the Violent Crime Control Law Enforcement Act of 1994. That Act had prohibited the possession of a "large capacity ammunition feeding device," defined as a "magazine" that has a "capacity of . . . more than 10 rounds of ammunition." 18 U.S.C. § 921(a)(31). Prior to the 2006 amendments, moreover, U.S.S.G. § 5K2.17 provided for a sentencing

enhancement when the offender possessed a "high-capacity semiautomatic firearm," which was similarly defined as a firearm that has a "magazine capacity of more than ten cartridges."

After the Act expired in 2004, the Commission amended § 2K2.1 and § 5K2.17 because Congress had allowed the cross-referenced Act to expire. In its "Reason for Amendment," the Commission explained that it had "received information regarding inconsistent application as to whether the enhanced base offense levels apply . . . in light of the ban's expiration." U.S.S.G. § 2K2.1, Amend. 691. The Commission therefore opted to "replace[] the reference [to the Act] with the term, 'a semiautomatic firearm that is capable of accepting a large capacity magazine.'" *Id.*

When this context is considered, the 2006 amendment—which merely replaced the cross-references to the Act and did not include any new definitions—did not make any substantive changes. *See Gordillo*, 920 F.3d at 1298 (explaining that the "2006 amendments [to § 2K2.1] were intended to clarify that the enhanced base offense levels continued to apply"); *cf. Hansen*, 599 U.S. at 775–78 (considering context and concluding that, when Congress removed words in a statute but left intact similar words, the change was "best understood as a continuation of the past, not a sharp break from it"). Instead, the term "large capacity magazine" is "obviously transplanted from another legal source"—the Act and the prior version of § 5K2.17—and, therefore, "brings the old soil with it." *See Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (quoting *Hall*, 584 U.S. at 73); Scalia & Garner, *Reading Law* 322 (explaining that if a term has been given a "uniform interpretation by . . . the responsible agency, a later version of that act perpetuating

the wording is presumed to carry forward that interpretation"); *id.* at 323 ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field . . .—it is reasonable to believe that the terminology bears a consistent meaning"); *Erlenbaugh v. United States*, 409 U.S. 239, 244 (1972) ("[W]henever Congress passes a new statute, it acts aware of all previous statutes on the same subject."). Under this "longstanding interpretive principle," the pre-existing definition was merely incorporated into § 2K2.1. *See Taggart*, 587 U.S. at 560. And with that understanding, Trumbull's Glock 17 qualifies as a "semiautomatic firearm that is capable of accepting a large capacity magazine," as that term was understood when § 2K2.1 was amended, because it could accept more than 10 rounds of ammunition.[2] *See* 18 U.S.C. § 922(a)(31) (repealed); U.S.S.G. § 5K2.17 (amended).

Second, there is overwhelming evidence that the common understanding of the term "large capacity magazine" encompasses magazines that can accept 17 rounds of ammunition. As the majority recognizes, at least 12 states restrict the possession of large capacity magazines. Maj. Op. at 10. Eight of those states define the term as a magazine that has the capacity to accept more than 10 rounds of ammunition. *See* Cal. Penal Code § 16740; Conn. Gen. Stat. Ann. § 53-202w(a)(1); Haw. Rev. Stat. Ann. § 134-8; Mass. Gen. Laws Ann. ch. 140, § 121; N.J. Stat. Ann.

---

[2] Although Application Note 2's definition of "large capacity magazine" is narrower than the prior definitions—as it applies only to firearms that can accept more than 15 rounds of ammunition—we have held that "Guidelines commentary need not be followed when it establishes a 'narrowing' construction not 'found in the Guideline text.'" *United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) (quoting *United States v. Lambert*, 498 F.3d 963, 971 (9th Cir. 2007)).

§ 2C:39-1; N.Y. Penal Law § 265.00; 11 R.I. Gen. Laws § 11-47.1-3; Wash. Rev. Code Ann. § 9.41.010(25). And 3 define the term to include those handgun magazines that can accept more than 15 rounds of ammunition. *See* Colo. Rev. Stat. § 18-12-301; 720 Ill. Comp. Stat. Ann. 5/24-1.10; Vt. Stat. Ann. tit. 13, § 4021. Under any of these definitions, Trumbull's 17-capacity magazine falls within the scope of the term "large capacity magazine" as that term has been long understood.

Considering the regulatory context, a semiautomatic firearm that can accept 17 rounds of ammunition, such as the Glock 17 that Trumbull possessed at the time of his offense, unambiguously constitutes a "semiautomatic firearm that is capable of accepting a large capacity magazine" for purposes of the Sentencing Guidelines. *See* U.S.S.G. § 2K2.1(a)(4)(B). Accordingly, the district court did not err when it enhanced Trumbull's base offense level pursuant to § 2K2.1(a)(4)(B).

*          *          *

In sum, the majority is mistaken to defer to the Sentencing Commission's commentary in Application Note 2 because the language of § 2K2.1 is not "genuinely ambiguous." *See Kisor*, 588 U.S. at 573–75. Nonetheless, the Glock 17 that Trumbull possessed at the time of his offense falls unambiguously within the meaning of the term "semiautomatic firearm that is capable of accepting a large capacity magazine" as that term was understood when § 2K2.1 was promulgated. U.S.S.G. § 2K2.1(a)(4)(B). The district court, therefore, properly enhanced Trumbull's base offense level for sentencing purposes pursuant to § 2K2.1(a)(4)(B).

For the foregoing reasons, I concur only in the judgment.