**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 05-4252

JAIME OCHOA BALDOVINOS,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Richard L. Voorhees, District Judge.
(CR-02-217)

Argued: November 30, 2005

Decided: January 9, 2006

Before WILKINSON, KING, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Wilkinson and Judge Shedd joined.

---

## COUNSEL

**ARGUED:** Aaron Edmund Michel, Charlotte, North Carolina, for Appellant. Amy Elizabeth Ray, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee. **ON BRIEF:** Gretchen C. F. Shappert, United States Attorney, Keith Cave, Assistant United States Attorney, Charlotte, North Carolina, for Appellee.

**OPINION**

KING, Circuit Judge:

Jaime Ochoa Baldovinos appeals from his convictions and sentence in the Western District of North Carolina on three drug offenses and a firearms offense. Baldovinos makes two contentions on appeal, both of which are constitutionally based: (1) that he is entitled to a new trial because he was deprived of the effective assistance of counsel; and (2) that his sentence must be vacated because he was involuntarily medicated with antipsychotic drugs for the purpose of rendering him competent to be sentenced. As explained below, we reject the ineffective assistance claim because it does not conclusively appear from the record that Baldovinos's lawyer was constitutionally ineffective. In resolving the involuntary medication claim, we conclude that our analysis is governed by the principles of *Sell v. United States*, 539 U.S. 166 (2003), we accept the prosecution's concession of plain error, and in the exercise of our discretion we decline to correct the error.

I.

On September 10, 2002, the grand jury charged Baldovinos with a single count of conspiring to possess with intent to distribute cocaine (21 U.S.C. § 846), two counts of possessing with intent to distribute cocaine (21 U.S.C. § 841(a)(1)), and one count of using a firearm during and in furtherance of a drug trafficking offense (18 U.S.C. § 924(c)). Baldovinos proceeded to trial and, on March 28, 2003, a jury convicted him on all four offenses.

A.

On June 6, 2003, prior to his sentencing, Baldovinos filed a motion in the district court seeking a transfer from the Mecklenburg County Jail (the "Jail") to the Federal Correctional Institution at Butner, North Carolina ("Butner") for a mental health evaluation. By Order of June 10, 2003, the court directed, pursuant to the provisions of 18 U.S.C. §§ 4241(a) and 4244,[1] that Baldovinos undergo an evaluation at But-

_____
[1]Section 4241(a) of Title 18, which applies "[a]t any time after the commencement of a prosecution for an offense and prior to the sentenc-

ner or a like facility, to determine whether he was suffering "from a mental disease or defect rendering him mentally incompetent to proceed with sentencing." J.A. 167-68.[2]

On August 1, 2003, the physicians at Butner submitted a report concerning Baldovinos's condition (the "First Report") to the district court. Based on the information available to them, the Butner physicians concluded that Baldovinos's mental health problems began in June 2003, after his trial had concluded. That information included the statement of a probation officer who had interviewed Baldovinos in May 2003 and remarked that he appeared "normal," and the statement of his counsel that Baldovinos had exhibited no signs of mental illness during his March 2003 trial or during his May 2003 interview with the probation officer. J.A. 245-46.

---

ing of the defendant," requires a court to conduct a competency hearing "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent."

Section 4244 of Title 18, on the other hand, only applies in a post-conviction setting. It provides for a hearing on the defendant's mental condition if "there is reasonable cause to believe that [he] may presently be suffering from a mental disease or defect for the treatment of which he is in need of custody for care or treatment in a suitable facility." 18 U.S.C. § 4244(a). Prior to conducting such a hearing, the court may, under § 4244(b), order that the defendant be psychologically examined. Pursuant to § 4244(d), "[i]f, after the hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect and that he should, in lieu of being sentenced to imprisonment, be committed to a suitable facility for care and treatment," the court must so commit the defendant. And under § 4244(d), "[s]uch a commitment constitutes a provisional sentence of imprisonment to the maximum term authorized by law for the offense for which the defendant was found guilty." If, before his provisional sentence has expired, the defendant recovers from his illness, § 4244(e) provides that "the court shall proceed finally to sentencing and may modify the provisional sentence."

[2]Citations to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in this appeal.

The First Report described in detail Baldovinos's troubled behavior after his transfer to Butner. Shortly after his arrival there, Baldovinos was "placed on suicide watch due to the severity of the behavioral disturbance." J.A. 247. Specifically, Baldovinos

> remained curled into the fetal position, on the concrete floor, under the bed, and he did not respond to verbal intervention. He would alternatively crouch for several hours in the corner of his room or in the shower. When he was touched by the staff, he would further cower, moan, become tearful, and withdraw in a frightened manner. He consumed little food and soiled himself. He resisted staff members' efforts to move and clean him.

*Id.* at 249. When Baldovinos refused to eat and drink on his own, leading to dehydration, the physicians emergently treated him with Haldol and Ativan — both short-acting antipsychotic drugs. Although the medication temporarily improved Baldovinos's condition, making him alert and reactive, he quickly decompensated. Some days later, after being treated for head lice (which involved cutting off much of his hair), Baldovinos beseeched the staff to kill him and smeared feces on the windows of his room. He was once again emergently treated with Haldol and Ativan, and he showed the same small but unsustained improvements in his condition.

Based on interviews with Baldovinos and observations of his behavior, the Butner physicians concluded that he suffered from catatonia. The cause of his catatonia, however, was unclear. The physicians principally diagnosed Baldovinos with a psychotic disorder, such as schizophrenia, but also explained that his catatonia could result from a neurological problem, a mood disorder (e.g., depression), or post-traumatic stress disorder. The doctors advised the court that, in order to make an accurate diagnosis of Baldovinos's illness, they needed his medical records and other documentation of his behavior from the Jail.

In the First Report, the physicians ultimately concluded that Baldovinos was not competent to be sentenced. However, given his brief positive responses to the earlier emergent treatments with Haldol and Ativan, the physicians asserted that there was a "substantial probabil-

ity" that they could restore Baldovinos's competency for his sentencing if the court extended his commitment period and authorized them to involuntarily administer antipsychotic medication. J.A. 251.

Referencing the Supreme Court's decision in *Sell v. United States*, 539 U.S. 166 (2003), the physicians articulated several reasons in support of their request for permission to treat Baldovinos with antipsychotic drugs. They first explained that treatment of psychotic symptoms, such as catatonia, with antipsychotic medication was "medically appropriate." J.A. 251. They also asserted that such treatment would be unlikely to significantly interfere with Baldovinos's ability to assist his counsel at sentencing, given that Baldovinos neither complained of, nor did the staff observe, any adverse side effects to his earlier emergent treatment. The physicians expressed hope that, after a period of treating Baldovinos with "typical" antipsychotic drugs, his condition would improve to the point that he would consensually take "atypical" drugs, which could only be administered orally and are generally associated with less severe side effects than their "typical" counterparts. *Id.* Finally, the physicians concluded that Baldovinos was "not amenable to other therapies at this time." *Id.* at 252.

The Butner physicians predicted that, after four months of treatment, Baldovinos would be restored to competency and could be finally sentenced under the Sentencing Guidelines, rather than provisionally sentenced, pursuant to 18 U.S.C. § 4244(d), to a suitable facility for care and treatment for the maximum authorized term. They warned that, if the court returned Baldovinos to the Jail, precautions would have to be taken to protect his safety, including possible sedation and careful attention to ensure that he "attends to activities of daily living (e.g., eating, drinking, toileting, showering), and does not harm himself." J.A. 252-53.

By Order of August 12, 2003, the district court found, for the reasons spelled out in the First Report, that Baldovinos was legally incompetent, and the court "[t]herefore" extended his commitment period for continued treatment. J.A. 216. The court also authorized the Butner physicians to involuntarily medicate Baldovinos and directed officials at the Jail to furnish the Butner physicians with any documentation concerning Baldovinos that they requested. At no time did Baldovinos or his lawyer object to his being medicated.

On January 13, 2004, the Butner physicians submitted a second report to the court (the "Second Report"), again concluding that Baldovinos was not competent to be sentenced, but expressing hope that his treatment with different antipsychotic medication would meet with greater success should the court extend Baldovinos's commitment period.[3] Based on information obtained from the Jail and on further observation of Baldovinos's behavior, the physicians diagnosed him with schizophrenia. Among other things, the records from the Jail revealed that Baldovinos had not experienced his first psychotic break in June 2003, but rather in August 2002 while being housed at the Jail. At that time, he had been treated with antipsychotic and antidepressant drugs and had responded positively, exhibiting no further signs of mental illness until May 2003. The Second Report concluded by requesting that the court defer provisionally sentencing Baldovinos under § 4244(d) "until attempts to restore [his] competency [had] been exhausted." J.A. 259.

On June 22, 2004, the Butner physicians submitted a third report to the court (the "Third Report"), concluding that Baldovinos was incompetent to be sentenced, but asserting a different diagnosis — schizoaffective disorder — and predicting that a hybrid treatment of risperidone (an antipsychotic drug) and antidepressants would produce better results. On August 24, 2004, the physicians submitted yet another report to the court (the "Fourth Report"), concluding that Baldovinos's competency had been restored. The physicians explained that, with an increased dosage of medication, Baldovinos no longer exhibited psychotic symptoms, that he expressed himself with ease, and that he "was logical, coherent, and goal directed." J.A. 230-31. They warned, however, that Baldovinos's competence was "contingent on medication compliance." *Id.* at 231. Because the physicians surmised that Baldovinos would stop taking his medication if given the opportunity, they recommended that he remain at Butner until his hearing was imminent.

The court thereafter scheduled a hearing in Charlotte for September 27, 2004, to assess whether Baldovinos was competent and, if so, to impose sentence on his four convictions. On September 22, 2004,

---

[3]From August 2003 to January 2004, the physicians had unsuccessfully treated Baldovinos with the antipsychotic drug Haloperidol.

Baldovinos was transferred from Butner to the Jail to await the hearing. The court was unable to proceed with the hearing "due to an apparent decline in [Baldovinos's] mental health," and, on September 27, 2004, it recommitted him to Butner for further evaluation. J.A. 170.

On December 20, 2004, the Butner physicians issued their fifth report to the court (the "Fifth Report"), again concluding that Baldovinos was competent to be sentenced. They reaffirmed their diagnosis of schizoaffective disorder, but also included a provisional diagnosis of malingering, i.e., "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives." J.A. 239. Specifically, the physicians observed that, while Baldovinos "cried, trembled, and looked sad" when with Butner staff, he "laughed and joked, and seemed full of energy" when with his peers. *Id.* Furthermore, although Baldovinos had ceased taking his medication when transferred to the Jail, the physicians found it suspicious that he had decompensated so quickly. Despite their concerns that Baldovinos could be malingering, the physicians recommended that the court's hearing on competency and sentencing be conducted via videoconference so that he could remain at Butner.

## B.

The court accepted the Butner physicians' recommendation and conducted his hearing on February 14, 2005, by videoconference. After determining that Baldovinos was competent, the court proceeded to sentencing. On the conspiracy offense, the court departed from the applicable Guidelines range on the basis of Baldovinos's mental illness, and it sentenced him to the statutory minimum term of sixty months in custody. It also imposed sentences of sixty months on each of the drug offenses, to run concurrently with the sixty months imposed on the conspiracy offense. Finally, the court sentenced Baldovinos to the statutory minimum of sixty months on the firearms offense, which was required by law to run consecutive to the conspiracy and drug sentences. Baldovinos thus received a total prison term of 120 months, the minimum sentence he could have received on the offenses for which he was convicted.

Baldovinos has filed a timely notice of appeal, and we possess jurisdiction pursuant to 28 U.S.C. § 1291.

II.

As noted, Baldovinos makes two constitutionally based contentions on appeal. Specifically, he asserts (1) that he is entitled to a new trial because his lawyer was ineffective in failing to investigate his mental health before trial; and (2) that his sentence should be vacated because the district court authorized the Butner physicians to involuntarily medicate him with antipsychotic drugs. We address these contentions in turn.

A.

Baldovinos first asserts that his lawyer was constitutionally ineffective in failing to properly investigate Baldovinos's mental condition prior to trial, a contention we may address on direct appeal only if the lawyer's ineffectiveness conclusively appears from the record. *See United States v. Russell*, 221 F.3d 615, 619 n.5 (4th Cir. 2000). In support of this assertion, Baldovinos emphasizes that the Jail's records indicated that he first suffered a psychotic break in August 2002, well before his March 2003 trial. Unfortunately for Baldovinos, the record fails to demonstrate that his lawyer was aware of his August 2002 illness, or that the lawyer otherwise performed in a constitutionally ineffective manner. Indeed, the First Report indicates that the lawyer did not discern any signs of Baldovinos's mental illness until June 2003, and there is nothing in the record to suggest otherwise. In these circumstances, constitutional ineffectiveness does not conclusively appear from the record, and the ineffective assistance claim is unreviewable at this stage.[4]

---

[4]Our conclusion that we may not review Baldovinos's ineffective assistance claim, of course, is not "intended to prejudice, or prejudge, in any way [his] right to apply for relief in a [habeas corpus] proceeding, should he choose to invoke such remedy." *United States v. Mandello*, 426 F.2d 1021, 1023 (4th Cir. 1970).

### B.

Baldovinos next maintains that the district court erred in authorizing the physicians at Butner to medicate him with antipsychotic drugs against his will, and that such error requires us to vacate his sentence. Because Baldovinos makes this contention for the first time on appeal, we review it for plain error only. *See United States v. Ruhbayan*, 406 F.3d 292, 301 (4th Cir. 2005). In order to prevail under a plain error analysis, a defendant must show (1) an error, (2) that such error was plain, (3) and that it affected his substantial rights. *Id.* (citing *United States v. Olano*, 507 U.S. 725, 732 (1993)). Even if a defendant satisfies this three-prong test, we should exercise our discretion to correct the error only if it seriously affects "the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (internal quotation marks omitted).

The Government asserts that the Supreme Court's decision in *Washington v. Harper*, 494 U.S. 210 (1990), governs our analysis of this issue, because the Government's purpose in medicating Baldovinos was — at least in part — to prevent him from harming himself and others. If the Government is wrong on this point, and if we proceed instead under the principles of *Sell v. United States*, 539 U.S. 166 (2003), the Government concedes that the plain error test would be satisfied. That is, it concedes that the district court erred in authorizing Baldovinos's involuntary medication for sentencing, that such error is plain, and that the error affected his substantial rights. The Government nevertheless maintains that we should decline to exercise our discretion to correct the error. As explained below, the *Sell* principles apply here, we assume that plain error has occurred, and we decline to correct the error.

### 1.

As an initial matter, we must assess whether this proceeding is governed by the principles of *Harper* or by those enunciated by the Court in *Sell*. As explained below, the purpose of medicating Baldovinos was to render him competent to be sentenced, and the *Sell* principles thus control our analysis.

In its *Harper* decision, the Court was presented in 1990 with the question of whether and when the Government could administer

antipsychotic drugs to a dangerous prisoner against his will. The Court recognized that a prisoner possesses "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause," 494 U.S. at 221-22, *quoted in Sell*, 539 U.S. at 178, but stressed that infringements on that interest must be viewed with an eye to the unique prison context and with the deference traditionally accorded the judgments of prison officials, *see Harper*, 494 U.S. at 223 (citing *Turner v. Safley*, 482 U.S. 78 (1987)). The Court ultimately determined that the Government may constitutionally "treat a prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest." *Id.* at 227.

In its *Sell* decision in 2003, the Court was again confronted with a situation in which the Government was seeking to administer unwanted antipsychotic drugs to a person in its ward. In *Sell*, however, the Government did not seek to medicate the defendant to prevent him from harming himself or others, but in order to render him competent to stand trial. In that situation, although the prosecution generally possesses an important interest "in bringing to trial an individual accused of a serious crime," it is not enough that the court finds medicating the defendant to be in his medical interests. *Sell*, 539 U.S. at 180. The prosecution is also obliged to prove (1) that involuntary medication will "significantly further" the Government's interest in prosecuting the defendant (i.e., that the medication is "substantially likely" to render the defendant competent and "substantially unlikely" to have side effects that significantly interfere with the defendant's ability to assist counsel); (2) that involuntary medication is "necessary" to further the Government's interest; and (3) that the medication is "medically appropriate," that is, in the defendant's best medical interests. *Id.* at 181 (emphasis omitted).[5]

---

[5]This Court recently had occasion to elaborate on the *Sell* requirements. *See United States v. Evans*, 404 F.3d 227 (4th Cir. 2005). In *Evans*, we emphasized that those principles require an exacting focus on the personal characteristics of the individual defendant and the particular drugs the Government seeks to administer. *See id.* at 240-42. We need not further address *Evans*, however, because the Government concedes that the district court erred under both *Sell* and *Evans* if those decisions apply here.

The Court in *Sell* emphasized that its principles were to apply only when determining "whether involuntary administration of drugs is necessary significantly to further a particular governmental interest, namely the interest in rendering the defendant *competent to stand trial*." *Id.* at 181. Although not explicit on this point, the Court indicated that the determination of which principles apply — those of *Harper* or those of *Sell* — depends on the purpose for which the Government seeks to medicate the defendant. For example, in explaining that involuntary medication is more appropriate on *Harper* grounds than on *Sell* grounds, the Court advised district courts which are "asked to approve forced administration of drugs for *purposes* of rendering a defendant competent" to "determine whether the *Government seeks*, or has first sought, permission for forced administration of drugs on . . . *Harper*-type grounds." *Id.* at 183 (emphasis added). Thus, for *Harper* to govern the analysis, it is not enough to demonstrate that medicating a defendant will prevent him from harming himself or others; the Government must show that the prevention of such harm was one of the purposes for which it sought authorization to medicate him.

With these principles in mind, it is clear that we should analyze Baldovinos's claim under *Sell* rather than under *Harper*, as the record demonstrates that the Government's overriding purpose in medicating Baldovinos was to render him mentally competent to be sentenced. The district court's Order of June 10, 2003, committed Baldovinos for the express purpose of determining whether he was suffering "from a mental disease or defect rendering him incompetent to proceed with sentencing." J.A. 167-68. More importantly, in its August 12, 2003 Order authorizing Baldovinos's involuntary medication, the court found Baldovinos to be incompetent and "[t]herefore" committed him for further treatment. J.A. 216. Furthermore, in the Fourth Report — which concluded that Baldovinos was competent to be sentenced — the Butner physicians recommended that Baldovinos remain at Butner until his sentencing was imminent, not to protect his safety, but to reduce the risk that he would decompensate before his competency and sentencing hearing could be conducted. The Fifth Report's final recommendation, that Baldovinos's hearing be conducted by videoconference, was made for the same reason. Because the Government sought to involuntarily medicate Baldovinos solely for the purpose of

sentencing, we are obliged to conclude, for the purposes of plain error analysis, that the *Sell* principles apply to this case.**[6]**

2.

As pointed out above, the Government has conceded that, if the *Sell* principles govern, the district court erred, the error was plain, and the error affected Baldovinos's substantial rights. For the purposes of this appeal, we accept the Government's concession.**[7]** As the Supreme

---

**[6]**To be sure, the record could support a conclusion that the medication administered to Baldovinos at Butner prevented him from harming himself. Indeed, the drugs administered by the Butner physicians ultimately transformed Baldovinos from a tormented person who tearfully cowered under his bed, refusing to take food or water, into a logical, goal-oriented man who laughed and joked with his peers. Moreover, the physicians at Butner were commendably concerned for Baldovinos's safety. They placed him on suicide watch when they sensed he was a danger to himself and they warned the court in the First Report that special precautions should be taken to protect his safety if he were returned to the Jail. These facts, however, only suggest that the Government *could have* medicated Baldovinos under *Harper* had it chosen to do so.

**[7]**Although we need not address the issue here, it appears yet unresolved whether the *Sell* principles permit the Government to involuntarily medicate a defendant for the purpose of rendering him competent to be *sentenced*. The *Sell* principles explicitly apply only where the Government's purpose in medicating a defendant is to render him "*competent to stand trial*." 539 U.S. at 181. Furthermore, although the Court in *Sell* concluded that the Government generally has an important interest in bringing an accused to trial for a serious crime, it emphasized that "[s]pecial circumstances" could mitigate the importance of that interest. *Id.* at 180. For example, the Court observed that a defendant's unwillingness to take medication could result in "lengthy confinement in an institution for the mentally ill" which "would diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime." *Id.* Although the Court advised that "civil commitment is [not] a substitute for a criminal trial," it made clear that "[t]he potential for future confinement affects . . . the strength of the need for prosecution." *Id.*

In the sentencing context, a court may, pursuant to 18 U.S.C. § 4244(d), "provisional[ly] sentence" an incompetent defendant to "a

Court explained in *Olano*, however, even if a defendant has demonstrated that an unpreserved error satisfies the requirements of Rule 52(b) of the Federal Rules of Criminal Procedure, we should exercise our discretion to correct the error only if it seriously affects "the fairness, integrity or public reputation of judicial proceedings." 507 U.S. at 736 (internal quotation marks omitted). Because any plain error that occurred in this case did not seriously affect the interests identified in *Olano*, we decline to exercise our discretion to correct the error.

The Government urges us to decline to recognize any such error because all those involved in medicating Baldovinos acted in good faith (a point which is unchallenged, and which we accept), believing that medicating him was in his own best interests. Although the good faith of those involved in such a process may have relevance to such an analysis, it should not be dispositive. If good faith were our sole guidepost in assessing whether to correct a plain error, such an error — regardless of its seriousness or the severity of its impact — would seldom, if ever, be recognized. In any event, we have consistently exercised our discretion to correct a plain error where no allegation of bad faith has been made. *See, e.g.*, *United States v. Hughes*, 401 F.3d 540, 555-56 (4th Cir. 2005) (exercising discretion to correct plain Sixth Amendment error in sentencing only because defendant received much longer sentence than authorized by law); *United States v. Floresca*, 38 F.3d 706, 713-14 (4th Cir. 1994) (correcting plain error on basis that defendant was convicted of unindicted offense).

Nonetheless, there are other reasons counseling us against recognition of any plain error that occurred here. First, Baldovinos has already been medicated against his will, and nothing we can do now will alter that fact. Importantly, a like circumstance played a role in the Supreme Court's determination in *Sell* that an order authorizing the involuntary administration of antipsychotic drugs is collaterally

---

suitable facility" for care and treatment for "the maximum term authorized by law for the offense for which the defendant was found guilty." Thus, not only is there a "potential for future confinement" under § 4244(d), the term of such confinement is likely to exceed the sentence the defendant would otherwise receive from the sentencing court.

appealable. *See Sell*, 539 U.S. at 177 (observing that "[a]n ordinary appeal comes too late for a defendant to enforce" right to avoid unwanted administration of antipsychotic medication). Second, this "ordinary appeal" presents the unusual circumstance where the defendant is potentially worse off — and in no case better off — if he prevails. If we were to vacate Baldovinos's sentence, and if he is presently incompetent to be sentenced, he could be provisionally sentenced to Butner or a similar institution pursuant to 18 U.S.C. § 4244(d). Such a provisional sentence must be, under law, for "the maximum term authorized . . . for the offense for which the defendant was found guilty," which we have interpreted to mean the statutory maximum. *See United States v. Roberts*, 915 F.2d 889, 892 (4th Cir. 1990). Baldovinos's conspiracy conviction alone (setting aside his substantive drug offenses and firearms offense) carries a statutory maximum of forty years, four times as long as the ten-year sentence he has already received. *See* 21 U.S.C. § 841(b)(1)(B)(ii)(II) (providing for maximum penalty of forty years where offense involved 500 grams or more of cocaine). Even if Baldovinos were competent to be sentenced (or were rendered competent through the constitutional administration of drugs), and therefore could be finally sentenced under the advisory Guidelines regime, our decision to vacate his sentence would not improve his position. As previously noted, Baldovinos has already received the minimum sentence permissible under law on his offenses. *See supra* Part I.B.

In these circumstances, we are unable to conclude that any error in medicating Baldovinos against his will seriously affected the "fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736 (internal quotation marks omitted). We fail to see how a remand in this case would enhance the fairness of these proceedings. Indeed, it is in part out of concern for Baldovinos's best interests that we decline to recognize any plain error that occurred in involuntarily medicating him. Were we presented with some explicit indication that Baldovinos truly desires to serve a provisional sentence of up to at least forty years, rather than the ten-year, statutory minimum sentence he has already received, our assessment would take that position into account. Such an explicit indication, however, has not been made to us.

We have no doubt that, in some situations, a judicial decision upholding the Government's administration of drugs against a per-

son's will could raise legitimate questions concerning the integrity of such proceedings. But the damage, if any, has already been done here, and we are powerless to reverse it. The inadequacy and potential unfairness of any remedy we might grant assures us that a decision to withhold such a remedy does not undermine the integrity of these proceedings. Finally, we are unable to perceive how our refusal to declare that Baldovinos has prevailed, and to simultaneously expose him to the possibility of a provisional sentence four times longer than the sentence he is serving (and in no case a shorter final sentence than the one he is serving), impugns the reputation of judicial proceedings. To the contrary, a judicial ruling reaching such a result would run a greater risk of undermining public confidence in judicial proceedings than the decision we render today.

## III.

Pursuant to the foregoing, we affirm the judgment of the district court.

*AFFIRMED*