**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 25-4041**

─────────────

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

JERONE TYRELL HOLMAN,

        Defendant – Appellant.

─────────────

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  William L. Osteen, Jr., District Judge.  (1:24−cr−00113−WO−1)

─────────────

Argued:  January 28, 2026                      Decided:  March 27, 2026

─────────────

Before WILKINSON, Circuit Judge, FLOYD, Senior Circuit Judge, and David J. NOVAK, United States District Judge for the Eastern District of Virginia, sitting by designation.

─────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Senior Judge Floyd and Judge Novak joined.

─────────────

**ARGUED:**  Margaret McCall Reece, FOX ROTHSCHILD LLP, Greensboro, North Carolina, for Appellant.  Karla E. Painter, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Kaitlyn K. Brenner, FOX ROTHSCHILD LLP, West Palm Beach, Florida, for Appellant.  Clifton T. Barrett, United States Attorney, Kyle D. Pousson, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

Jerone Holman was sentenced to 66 months in prison for possessing a firearm and ammunition as a felon. He now challenges that result on several grounds: that his conviction violates the Second Amendment, that his sentence erroneously reflects a large-capacity magazine enhancement, and that his sentence is unreasonable. We reject all three arguments. Along the way, we revisit the standards governing plain error review under Federal Rule of Criminal Procedure 52(b).

I.

Around two in the morning one day in 2023, Holman crashed his car. When the police found him on the side of the highway, Holman admitted he had been drinking. Then, when the officers searched the crash scene, they found a vodka bottle and a handgun loaded with a magazine lying on the ground ten or fifteen feet away from the car. In the front seat of the car, they found a second magazine that matched the first one and also fit inside the gun. The gun had been reported stolen.

Since Holman had two felonies on his record, he was charged with possession of a firearm and ammunition by a felon in violation of 18 U.S.C. § 922(g)(1). He sought to dismiss the indictment on the ground that § 922(g)(1) violated the Second Amendment, but the district court rejected his argument. Holman then pled guilty while reserving his right to appeal the constitutional issue.

The presentence report (PSR) prepared by the U.S. Probation Office noted that the magazines and firearm recovered from the crash scene "contained a total of 32 rounds" of ammunition, meaning that, by necessary implication, "at least one of the magazines had a

capacity exceeding 15 rounds." J.A. 162. On this basis, the PSR classified Holman's offense as one involving a "semiautomatic firearm that is capable of accepting a large capacity magazine." U.S. Sent'g Guidelines Manual § 2K2.1(a)(3) (U.S. Sent'g Comm'n 2023). That classification dictated his base offense level under the Sentencing Guidelines.

Holman did not object. In fact, when the district court asked if Holman had reviewed the PSR with counsel and "agree[d]" with it, he responded "[y]es, I have," and "[y]es, sir, I do." J.A. 99–100. The court proceeded to adopt the PSR without change and sentenced Holman to 66 months in prison.

This appeal followed.

## II.

First we address the constitutional arguments Holman preserved below. As he sees things, the felon-in-possession prohibition in 18 U.S.C. § 922(g)(1) violates the Second Amendment both facially and as applied to him. We consider these arguments de novo, *United States v. Jacobs*, 166 F.4th 395, 398 (4th Cir. 2026), but they "merit little discussion" because they run headlong into our precedent, *id.* at 399.

## A.

As to Holman's facial challenge, it is foreclosed by *United States v. Canada*, 123 F.4th 159 (4th Cir. 2024). In that case, a panel of this court considered the constitutionality of § 922(g)(1) in light of *District of Columbia v. Heller*, 554 U.S. 570 (2008), *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and *United States v. Rahimi*, 602 U.S. 680 (2024). The panel concluded the provision "has a plainly legitimate sweep." *Canada*, 123 F.4th at 161 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S.

3

442, 449 (2008)). Since "one panel cannot overrule another," the question is now settled. *McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc).

## B.

As to Holman's as-applied challenge, it is foreclosed by *United States v. Hunt*, 123 F.4th 697 (4th Cir. 2024). In that case, a panel of this court rejected as-applied challenges to § 922(g)(1) except where (1) the defendant's "felony conviction is pardoned or [(2)] the law defining the crime of conviction is found unconstitutional or otherwise unlawful." *Id.* at 700 (quoting *Hamilton v. Pallozzi*, 848 F.3d 614, 626 (4th Cir. 2017)). Holman does not contend that he falls into either exception. Without more, there is nothing to his claim.

Holman tries to chart a course around *Hunt* by arguing that it did not address the kind of as-applied challenge he brings here. But *Hunt*'s holding was not limited to particular kinds of as-applied challenges. To the contrary, *Hunt* explained in categorical terms that this court rejects, aside from the two exceptions above, "the need for any case-by-case inquiry about whether a felon may be barred from possessing firearms." *Id.* at 704.

Holman is not the first felon-in-possession defendant who has sought to avoid *Hunt*. Time and again others have tried, and time and again we have rejected their efforts. *See, e.g.*, *United States v. Beaufort*, No. 25-4358, 2026 WL 195427, at *1 (4th Cir. Jan. 26, 2026) (per curiam); *United States v. Logan*, No. 24-4421, 2026 WL 66744, at *1 (4th Cir. Jan. 8, 2026) (per curiam); *United States v. Heaggeans*, No. 25-4141, 2025 WL 3082286, at *1 (4th Cir. Nov. 4, 2025) (per curiam); *United States v. Rosell*, No. 25-4152, 2025 WL 4061611, at *1 (4th Cir. Oct. 16, 2025). Let there now be no doubt: the rule announced in *Hunt* covers *all* as-applied challenges to § 922(g)(1).

4

C.

Even if *Hunt* did not resolve Holman's as-applied challenge, we would still conclude his claim has no merit. The Constitution permits the government to disarm him.

Our two-step analytical framework is supplied by *Bruen*. At step one, we ask whether "the Second Amendment's plain text covers" the conduct at issue. *Bruen*, 597 U.S. at 24. At step two, we ask whether the law regulating that conduct "is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The conduct at issue here is possession of a firearm and ammunition by someone with Holman's criminal record, so we take a moment to recount it. In 2010, Holman stole $1,000 worth of cash and electronics by holding a person at gunpoint. He was convicted of felony robbery with a dangerous weapon and served three years in prison for it. Then, in 2015, he was found with a gun with an obliterated serial number. He was convicted of possession of a firearm by a felon—itself a felony—and served two years in prison for that.

While on supervised release for the felon-in-possession conviction, Holman repeatedly used alcohol and drugs, attempted to circumvent alcohol monitoring technology, and failed to complete office visits and substance abuse treatment. His violations were so problematic that his term of supervised release was extended once and revoked twice, causing him to be sentenced to another two and a half years in prison. And in 2020, Holman was convicted of misdemeanor driving while impaired and sentenced to another 30 days imprisonment for that.

After spending the better part of a decade in prison for gun-related crimes and knowing that the law forbade him from acquiring another gun, Holman did so anyways.

5

This time, his gun was stolen (either by Holman or by someone else), and Holman drove around with it fully loaded at two in the morning after he had been drinking.

Does "the Second Amendment's plain text" protect the right of someone with this record to keep and bear arms? *Bruen*, 597 U.S. at 24. Under our precedent, the answer is "no." The Amendment protects the right of "the people." U.S. Const. amend. II. The Supreme Court has described this group as including "law-abiding, responsible citizens," *Heller*, 554 U.S. at 635, and we have taken that instruction to delineate the group's outer bounds at *Bruen* step one, *United States v. Price*, 111 F.4th 392, 400 (4th Cir. 2024) (en banc) ("[T]he limitations on the Second Amendment right identified by *Heller* are inherent in the meaning of 'the right of the people' . . . ."); *see also Hunt*, 123 F.4th at 705.

"However the Supreme Court may come to define a 'law-abiding responsible citizen' for Second Amendment purposes, [Holman] surely would not fall within that group." *United States v. Moore*, 666 F.3d 313, 319 (4th Cir. 2012). His first felony, North Carolina robbery with a dangerous weapon, is a "violent felony" within the meaning of the Armed Career Criminal Act, *United States v. Burns-Johnson*, 864 F.3d 313, 315 (4th Cir. 2017), and a "crime of violence" within the meaning of the Sentencing Guidelines, *United States v. Pittman*, 728 F. App'x 197, 198–99 (4th Cir. 2018) (per curiam). In historical terms, it is also the type of "crime[] against the person" thought to "speak directly to whether an individual is dangerous." *United States v. Williams*, 113 F.4th 637, 658 (6th Cir. 2024). This violent crime, considered alongside Holman's long train of drug, alcohol, and gun-related violations, reveals a persistent disregard for the rule of law and for the safety of others.

Holman's disarmament is also consistent with our nation's traditions at *Bruen* step two. "Since the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms." *Rahimi*, 602 U.S. at 690. The Supreme Court in *Rahimi* identified two such types of Founding-era laws: surety laws and "going armed" laws. *Id.* at 695–98. Shortly after, we identified another: laws disarming "groups of persons that the legislature deemed 'potentially violent or dangerous.'" *United States v. Jackson*, 152 F.4th 564, 577 (4th Cir. 2025) (quoting *Hunt*, 123 F.4th at 707).

Like Founding-era surety laws, § 922(g)(1) as applied to Holman is "a mechanism for preventing violence before it occur[s]." *Rahimi*, 602 U.S. at 697. Like Founding-era "going armed" laws, § 922(g)(1) as applied to Holman is "a mechanism for punishing [someone] who ha[s] menaced others with firearms." *Id.* And like Founding-era laws that disarmed categories of persons deemed suspect, § 922(g)(1) as applied to Holman ensures that we do not "let[] guns fall into criminal hands." *Jackson*, 152 F.4th at 577. In all these ways, § 922(g)(1) as applied to Holman echoes the "[w]hy and how" of our historical tradition of firearm regulation. *Rahimi*, 602 U.S. at 692.

Between *Canada*, *Hunt*, and the *Bruen* two-step, Holman's Second Amendment challenge to his conviction fails multiple times over.

## III.

Next we address an argument Holman raises for the first time on appeal: that the district court should not have applied § 2K2.1(a)(3) of the Sentencing Guidelines (the "large capacity magazine" provision). Holman did not object to the provision's application

below, and indeed told the district court that he "agree[d]" with it, J.A. 99–100, so we consider the argument under a plain error standard of review, *Molina-Martinez v. United States*, 578 U.S. 189, 193–94 (2016).

We conclude there was no error, much less one that would warrant reversal.

## A.

At the foundation of our plain error analysis lies the contemporaneous objection rule. When "a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue." *Puckett v. United States*, 556 U.S. 129, 134 (2009). "No procedural principle"—or procedural rule—"is more familiar." *Yakus v. United States*, 321 U.S. 414, 444 (1944).

Contemporaneous objections serve many salutary functions. If a district court agrees with a claim of error raised in an objection, it may remedy the error immediately and thereby "avoid the delay and expense of a full appeal." *Puckett*, 556 U.S. at 140. If the court disagrees with the claim of error, it may at least create a record that will facilitate effective appellate review. In either case, the trial judge is given the opportunity to apply his instincts to the question. His familiarity with the proceedings in front of him makes him the most practiced and informed decisionmaker.

Forfeiture is the rule's enforcement mechanism. By default, failure to object to an error in the district court "precludes the raising on appeal of the unpreserved claim." *Id.* at 135. The threat of forfeiture keeps counsel "on his toes," motivating him to object to any potential errors. *United States v. Vonn*, 535 U.S. 55, 73 (2002). It also deters counsel from strategically remaining quiet and then raising an objection only if his client loses the case,

8

a tactic known as "sandbagging." *Puckett*, 556 U.S. at 134. And it furthers finality, that underappreciated virtue on which the stability of our judicial system relies.

Of course, the contemporaneous objection rule presents risks in addition to benefits. One risk is that counsel will act like a jack-in-the-box, jumping to his feet with objections more often than is necessary. This kind of lawyering disserves the client and "completely disrupts the rhythm of the proceedings." *United States v. Moore*, 769 F.3d 264, 268 (4th Cir. 2014) (making a similar point with respect to motions during trial).

Another more serious risk is the possibility of grave injustice. In the heat of trial, counsel cannot be expected to lodge objections with the thoughtfulness and precision he could bring to a written brief. He might on occasion, for no reason other than a lapse of attention, fail to object to an error that really matters. If courts of appeals were too "rigid and undeviating" about forfeiture, and we "invariably and under all circumstances decline[d] to consider" claims of error not raised below, there would be no way to correct the rare but all too real "miscarriage of justice." *Hormel v. Helvering*, 312 U.S. 552, 557–58 (1941).

Federal Rule of Criminal Procedure 52(b) resolves these tensions. It provides that courts of appeals "may" consider a forfeited error, but only when it is a "plain error that affects substantial rights." Fed. R. Crim. P. 52(b). By authorizing a limited exception to our standard practice for "particularly egregious errors," Rule 52(b) preserves the benefits of the contemporaneous objection rule while minimizing its attendant risks. *United States v. Frady*, 456 U.S. 152, 163 (1982). It also privileges the on-the-spot decisionmaking

9

capacity of the trial judge without shutting the door entirely to appellate review. Each rung in our hierarchical judicial system is given its due.

The Supreme Court explained in *United States v. Olano*, 507 U.S. 725 (1993), how Rule 52(b) should work in practice. It involves a four-prong test. When there is (1) an "error" (2) that is "plain" and (3) that "affect[s] substantial rights," a court of appeals may consider it. *Id.* at 732 (alteration in original). Whether to correct the error nevertheless remains "within the sound discretion of the court," *id.*, and the court should exercise that discretion only when (4) the error "seriously affect[s] the fairness, integrity[,] or public reputation of judicial proceedings," *id.* (alteration in original) (quoting *United States v. Young*, 470 U.S. 1, 15 (1985). The defendant has the burden of persuasion at each prong. *Greer v. United States*, 593 U.S. 503, 508 (2021).

Although there are four distinct prongs to *Olano*, the inquiry is a holistic one. The underlying question for the court of appeals is whether there are "exceptional circumstances" justifying a departure from the standard objection and forfeiture rules. *United States v. Atkinson*, 297 U.S. 157, 160 (1936). Because correction of an unpreserved error is "not a run-of-the-mill remedy," courts should provide it "sparingly." *Frady*, 456 U.S. at 163 n.14 (quoting *United States v. Gerald*, 624 F.2d 1291, 1299 (5th Cir. 1980)). "Meeting all four prongs is difficult, 'as it should be.'" *Puckett*, 556 U.S. at 135 (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 83 n.9 (2004)).

B.

Holman's effort fails at the first prong. There was no error in the proceedings here.

10

Holman believes the district court erred by applying § 2K2.1(a)(3) of the Sentencing Guidelines when calculating his base offense level. This provision applies by its terms to offenses that "involve[]" a "semiautomatic firearm that is capable of accepting a large capacity magazine." U.S. Sent'g Guidelines Manual, *supra*, at § 2K2.1(a)(3). He offers two reasons why it should not apply here. First, he says there is no evidence that either of the magazines recovered from his crash scene was "large capacity." Second, he says there is no evidence that the gun recovered was "capable of accepting" them. We take each argument in turn.

1.

In addressing Holman's "large capacity" argument, we must first decide what "large capacity" means. We need not do so on a blank slate, however, because the Sentencing Commission has offered its own definition in the commentary to the guidelines. We should defer to this definition if (1) § 2K2.1(a)(3) is "genuinely ambiguous," (2) the definition is "reasonable," and (3) "the character and context of the [Sentencing Commission's] interpretation entitles it to controlling weight." *Kisor v. Wilkie*, 588 U.S. 558, 574–76 (2019); *see also United States v. Mitchell*, 120 F.4th 1233, 1238–41 (4th Cir. 2024) (establishing that *Kisor* is the appropriate framework for deference to Sentencing Commission commentary).

To begin, we join the Third and Ninth Circuits in concluding that "large capacity" in § 2K2.1(a)(3) is genuinely ambiguous. *United States v. McIntosh*, 124 F.4th 199, 207 (3d Cir. 2024); *United States v. Trumbull*, 114 F.4th 1114, 1118 (9th Cir. 2024). "Large" can mean "exceeding most other things of like kind [] in quantity or size," which would

suggest that it matters how many rounds "most other" magazines can accommodate. *Large*, Merriam-Webster Online Dictionary (last visited Mar. 4, 2026). But "large" can also mean "dealing in great numbers or quantities," which would suggest a number of rounds that is simply high on its own, irrespective of most other magazines. *Id.* The text of § 2K2.1 does not reveal which meaning is at play or, if it is the second meaning, how many rounds would be sufficiently high.

The provision's history and purpose do little to resolve this ambiguity. Prior to 2006, § 2K2.1(a)(3) applied to offenses that involved a "semiautomatic assault weapon" as defined in a 1994 law. U.S. Sent'g Guidelines Manual, *supra*, at app. C, vol. III, amend. 691; Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 110102(b)(30), 108 Stat. 1796, 1997. When the 1994 law expired, § 2K2.1(a)(3) was amended and the reference to a "semiautomatic assault weapon" was replaced with "a semiautomatic firearm capable of accepting a large capacity magazine." The Sentencing Commission said the new language was intended to cover firearms that could, like semiautomatic assault weapons, "fire many rounds without reloading," which makes them more dangerous than other firearms. U.S. Sent'g Guidelines Manual, *supra*, at § 2K2.1 cmt. n.2. While the Commission's reference to "many rounds" suggests that the "large" in "large capacity" might mean "dealing in great numbers or quantities," it still does nothing to clarify how many rounds is the relevant threshold.

The Third Circuit has offered a compelling explanation: "[T]here simply is no such thing as a 'large capacity magazine.' It is a regulatory term created by the State, meaning no more than the maximum amount of ammunition the State has decided may be loaded

12

into any firearm at one time." *McIntosh*, 124 F.4th at 207 (quoting *Ass'n of N.J. Rifle & Pistol Clubs v. Att'y Gen.*, No. 19-3142, 2022 WL 22860232, at *4 (3d Cir. Aug. 25, 2022) (Matey, J., dissenting)).

Having concluded the term is ambiguous, we turn to the definition offered in the Sentencing Guidelines commentary: a large capacity magazine is one that can "accept more than 15 rounds." U.S. Sent'g Guidelines Manual, *supra*, at § 2K2.1 cmt. n.2. Like the Third and Ninth Circuits, we conclude this definition is reasonable. At least 12 states regulate the possession of large capacity magazines, and all of them except one define "large capacity" as more than 10 or 15 rounds. *McIntosh*, 124 F.4th at 210 n.8; *Trumbull*, 114 F.4th at 1119 & nn.3–6. In its now-expired 1994 law, Congress itself defined "large capacity" as more than 10 rounds. Violent Crime Control and Law Enforcement Act § 110103(b)(31)(A), 108 Stat. at 1999. Given the number of definitions that use 10 rounds, the use of 15 here is especially cautious. At the very least, 15 falls within the "zone of ambiguity" created by § 2K2.1(a)(3). *Kisor*, 588 U.S. at 576.

10 and 15 were evidently chosen as thresholds because Congress and many state legislatures believed that criminals who could fire that many rounds without needing to reload presented a special danger. Maryland, for example, banned magazines with more than 10 rounds because it concluded that "more shots are fired and more fatalities and injuries result" when these magazines are used. *Kolbe v. Hogan*, 849 F.3d 114, 127 (4th Cir. 2017) (en banc), *abrogated on other grounds by Bruen*, 591 U.S. 1. California did the same because it concluded that they "enable mass killings." *Duncan v. Bonta*, 133 F.4th 852, 863 (9th Cir. 2025) (en banc). It would be presumptuous for courts to declare that the

13

Sentencing Commission's choice of 15 was unreasonable in the face of a nearly equivalent legislative consensus.

Finally, we conclude that the "character and context" of the Sentencing Commission's definition do indeed "entitle[] it to controlling weight." *Kisor*, 588 U.S. at 576. This step in the *Kisor* inquiry is intended to determine based on the totality of the circumstances whether deference is appropriate. The answer will usually be "yes" when the Sentencing Commission's commentary is at issue. The commentary is published in the Sentencing Guidelines Manual and cannot be promulgated without an affirmative vote of the Commission's governing body, rendering it far more significant than merely an internal memorandum or post-hoc litigating position. U.S. Sent'g Comm'n R. Prac. & Proc. 2.2(b). It is instead the Commission's "authoritative" position. *Kisor*, 588 U.S. at 577. Moreover, it is the Commission's position on matters at the center of its obligation to "determine the relative severity of federal crimes." *Mistretta v. United States*, 488 U.S. 361, 377 (1989); *see also Stinson v. United States*, 508 U.S. 36, 45 (1993) ("[T]he commentary represent[s] the most accurate indications of how the Commission deems that the guidelines should be applied."). As a result, the commentary almost by definition "implicate[s] [the Commission's] substantive expertise." *Kisor*, 588 U.S. at 577.

Given the intensive process required to promulgate the commentary, it also, in most cases, reflects the Commission's "fair and considered judgment." *Id.* at 579. It certainly does here, where the "more than 15 rounds" definition appeared in the Federal Register for public notice and comment before it was submitted to Congress for review. 71 Fed. Reg.

14

4782, 4789 (Jan. 27, 2006); 71 Fed. Reg. 28063, 28069 (May 15, 2006). These features render it a heartland example of an agency interpretation to which deference is appropriate.

All that remains is deciding whether Holman possessed a magazine that met the definition in the Commission's commentary—that is, a magazine that could accept more than 15 rounds. We conclude that he did. Recall that two magazines were recovered from his crash scene. While the record does not reveal exactly how many rounds each magazine contained, the government's statement of facts at sentencing said that a total of 31 rounds was recovered from the two magazines, J.A. 77–78, and the PSR added that 32 rounds were recovered from "[t]he magazines and firearm," J.A. 162. The most logical conclusion from these statements, considered together, is that one round was located in the gun's firing chamber and that 31 rounds were dispersed between the two magazines. One of the magazines therefore must have held more than 15 rounds.

2.

Holman contends that even if one of the magazines he possessed was "large capacity," it was still error to apply § 2K2.1(a)(3) because there is no evidence his gun was "capable of accepting" it. He takes particular issue with the Sentencing Commission's commentary, which defines a firearm "capable of accepting" a magazine as a firearm with the magazine "attached to it" or "in close proximity to" it "at the time of the offense." U.S. Sent'g Guidelines Manual, *supra*, at § 2K2.1 cmt. n.2.

We need not consider the precise meaning of "capable of accepting" or the reasonableness of the commentary's interpretation, however, because Holman's gun was quite obviously capable of accepting both his magazines. The record states that the gun

15

was loaded with one of the magazines at the time it was discovered, and that the other magazine "matched" the gun, J.A. 162, and "fit inside" it, J.A. 77. Holman has not contested these facts. Whatever the definition of a firearm that is "capable of accepting" a magazine, it surely covers a firearm that can be loaded with the magazine and that "matche[s]" and "fit[s]" the magazine.

C.

Holman's effort alternatively fails at the second prong of *Olano*. Even if there was an error in the application of § 2K2.1(a)(3), the error was not plain.

In the context of Rule 52(b), "plain" means "clear or obvious, rather than subject to reasonable dispute." *Puckett*, 556 U.S. at 135. The point of the plainness requirement is to identify errors so beyond debate that "the trial judge and prosecutor were derelict in countenancing" them even without being put on notice by an objection. *Frady*, 456 U.S. at 163. "This standard is satisfied when the settled law of the Supreme Court or this circuit establishes that an error has occurred." *United States v. Neal*, 101 F.3d 993, 998 (4th Cir. 1996) (internal quotation marks omitted) (citation omitted).

If the firearm at Holman's crash scene was not "capable of accepting a large capacity magazine" within the meaning of § 2K2.1(a)(3), it is not because the settled law of the Supreme Court or this circuit has said so. We are not aware of any Supreme Court decisions or authoritative Fourth Circuit decisions interpreting the phrase. Evidently Holman is not aware of authoritative precedent in his favor either, because the only relevant decisions he points to are ones outlining general rules about when it is appropriate to defer to the Sentencing Commission's commentary. While Holman might disagree with our conclusion

16

that the rules make deference appropriate here, deference is certainly not so inappropriate as to be clearly and obviously so.

D.

We now arrive at the third and fourth prongs of *Olano*, where presumptions by the Supreme Court inform our analysis.

The third prong of *Olano* asks whether a plain error "affec[ted] substantial rights." *Olano*, 507 U.S. at 734. In most cases, a plain error affects substantial rights only if it was "prejudicial," meaning it "affected the outcome of the district court proceedings." *Id.* In other words, "but for [the error claimed,] the result of the proceeding would have been different." *Dominguez Benitez*, 542 U.S. at 82 (alteration in original) (citation omitted).

When the error is a miscalculation of the defendant's Sentencing Guidelines range, the Supreme Court has dictated a presumption: "the error itself can, and most often will, be sufficient to show a reasonable probability of a different outcome absent the error." *Molina-Martinez*, 578 U.S. at 198. "There may be instances," however, "when, despite application of an erroneous Guidelines range, a reasonable probability of prejudice does not exist." *Id.* at 200. "[F]or example," the record in a case may show that "the district court thought the sentence it chose was appropriate irrespective of the Guidelines range." *Id.*

The fourth prong of *Olano* asks whether, if there was a plain error that affected substantial rights, it "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Olano*, 507 U.S. at 736. This prong gives meaning to the word "may" in Rule 52(b), providing courts of appeals "broad discretion in determining whether a remand . . . is necessary" even when the first three *Olano* factors have been met. *Molina-*

17

*Martinez*, 578 U.S. at 204. If courts skipped over this prong or gave it short shrift, "the discretion afforded by Rule 52(b) would be illusory." *Olano*, 507 U.S. at 737.

In keeping with its discretion-enhancing function, this prong "is meant to be applied on a case-specific and fact-intensive basis." *Puckett*, 556 U.S. at 142. When the Supreme Court has applied it, it has several times found that a plain error that affected substantial rights should be not be corrected when "overwhelming" and "essentially uncontroverted" evidence supported the outcome below. *Johnson v. United States*, 520 U.S. 461, 470 (1997); *United States v. Cotton*, 535 U.S. 625, 632–33 (2002); *accord United States v. Marcus*, 560 U.S. 258, 265–66 (2010). In such cases, the "real threat" to the fairness, integrity, and public reputation of judicial proceedings would in fact have been reversal. *Cotton*, 535 U.S. at 634. We have also found relevant the "good faith" of those responsible for the error, *United States v. Baldovinos*, 434 F.3d 233, 242 (4th Cir. 2006), and their "collective conduct" during the proceedings, *United States v. Garrett*, 141 F.4th 96, 112 (4th Cir. 2025).

Like in the third prong, however, there is a presumption at play in the fourth prong. When the error is a miscalculation of the defendant's Sentencing Guidelines range, "such an error will in the ordinary case[] . . . seriously affect the fairness, integrity, or public reputation of judicial proceedings, and thus will warrant relief." *Rosales-Mireles v. United States*, 585 U.S. 129, 132 (2018). Unless, however, "countervailing factors" overcome the presumption. *Id.* at 142.

Presumptions of course assist the appellate court, but do not in the end relieve it of its obligation to conduct under *Olano* a holistic review of the sentencing proceedings. This

18

court has for years underscored the need for careful and measured judgment in such proceedings. *See, e.g.*, *United States v. Fowler*, 58 F.4th 142, 153 (4th Cir. 2023) ("The [district] court must [] conduct 'an individualized assessment based on the facts before the court.'" (quoting *United States v. Lewis*, 958 F.3d 240, 243 (4th Cir. 2020)). Where district courts approach their important sentencing responsibilities with sensitivity to the task before them, the last thing they deserve is a reversal, especially when the asserted error was never once brought to their attention.

The sentencing proceedings below bore the earmarks of conscientious consideration. They reflected credit, not discredit, on the fairness, integrity, and public reputation of judicial proceedings generally. When the defendant pled guilty, the district judge took considerable care—as every judge should—to explain the consequences of that choice and confirm it was voluntary. When the defendant returned to the courtroom for sentencing, the judge gave him a meaningful opportunity—as every judge should—to tell his story and make his case. That the sentence imposed was ultimately serious does not mean that the process was in any way unfair.

Nor does it mean that the sentence itself was unfair. The district court was faced with a defendant who spent nearly a decade in and out of jail for gun-related offenses, including a crime of violence, and was consistently unable to learn his lesson. "How much time" in jail, the court asked Holman directly, "is it going to take to make you not pick that gun up?" J.A. 116. Until Holman "starts making the decisions" to abide by the law, the court added, "these sentences are only going to get longer and longer and longer." J.A. 121.

19

When the court landed on 66 months, it explained that it had carefully weighed the 18 U.S.C. § 3553(a) factors and chosen a sentence that was "sufficient but not greater than necessary" to deter Holman and protect the public. J.A. 122. We agree.

IV.

Finally, Holman challenges the reasonableness of his sentence. We review the sentence for abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). Since the sentence is within a correctly calculated Sentencing Guidelines range, it is "presumptively reasonable." *United States v. Susi*, 674 F.3d 278, 289 (4th Cir. 2012).

According to Holman, the district court failed to consider his argument that he needed a firearm for self-defense. A district court "must address or consider all non-frivolous reasons presented for imposing a different sentence and explain why [it] has rejected those arguments," so failure to consider a key argument would render Holman's sentence procedurally unreasonable. *United States v. Perez-Paz*, 3 F.4th 120, 127 (4th Cir. 2021) (alteration in original) (citation omitted).

But the district court did consider Holman's self-defense argument, and amply so. It simply rejected it. The court observed that because Holman had chosen to pick up a gun with a large capacity magazine and carry it while driving drunk at two in the morning, his self-defense narrative was "not a very compelling" one. J.A. 107. "You want to protect yourself from those people who shouldn't be carrying guns around," the court told him, "but you're one of the people that shouldn't be carrying guns around." *Id.* In light of this consideration, Holman's sentence is procedurally reasonable.

20

Holman contends his sentence is substantively unreasonable for the exact same reason, but the argument is no more availing under a different header. In light of the district court's thoughtful weighing of the § 3553(a) factors, his sentence is substantively reasonable.

V.

Each of Holman's arguments is, at bottom, an attack on the United States government's ability to control crime. In the system he envisions, Congress would not be able to prohibit violent felons from possessing guns, and the Sentencing Commission would not be able to consider whether a magazine contains more than 15 rounds when determining an appropriate punishment. Fortunately, that is not our system. Because the Constitution and the rule of law permit the government to do both, the judgment of the district court is affirmed.

*AFFIRMED*

21